**UNITED STATES of America,
Plaintiff,**

v.

**TOLEDO, PEORIA & WESTERN RAILROAD COMPANY, Defendant.**

**UNITED STATES of America,
Plaintiff,**

v.

**The PENNSYLVANIA RAILROAD COMPANY, Defendant.**

**Civ. Nos. 378, 381.**

United States District Court
N. D. Indiana,
Hammond Division
at Lafayette.

Jan. 25, 1968.

J. Thomas Furphy, Dept. of Transportation, Federal Railroad Administration, Washington, D. C., Alfred W. Moellering, U. S. Atty., Fort Wayne, Ind., for plaintiff.

Robert H. Bierma, Chicago, Ill., J. A. Bruggeman, John M. Clifton, Fort Wayne, Ind., for defendants.

## MEMORANDUM OF DECISION AND JUDGMENT

ESCHBACH, District Judge.

This proceeding is a consolidation of three actions filed against the defendant Toledo, Peoria & Western Railroad Company on January 3, 1967 and two actions filed against the defendant Pennsylvania Railroad Company on January 18, 1967. In these actions, the Government seeks to recover statutory penalties of $250 each for alleged violations of 45 U.S.C. § 9, which is also known as the Power or Train Brakes Safety Appliance Act of 1958. The parties have stipulated that these five actions present an identical question of law and that a determination of one of these actions will be a binding determination of the other four. The parties have also stipulated that the Government's second claim against Pennsylvania is typical of the five. The parties have entered into a detailed stipulation of the facts governing these cases and have filed briefs in support of their positions. The stipulations and briefs have been considered by the Court. The Court finds that the defendants have violated 45 U.S.C. § 9 and that the Government is therefore entitled to recovery of the statutory penalties.

These actions arise from a joint freight service which these two defendant railroads have established between East Peoria, Illinois, and Logansport, Indiana. The train which is involved in the Government's second claim against Pennsylvania was a part of this service. The train was made up at East Peoria, which is on the line of Toledo. The train was manned by a Toledo crew as far as Effner, Indiana, which is the corporate boundary between the two railroads. At Effner, the Toledo crew disembarked, and a Pennsylvania crew boarded the train. No other change to the train was made at Effner. The brakes of the train were not inspected at Effner. The Pennsylvania crew then took the train over Pennsylvania lines to Logansport, Indiana. The operation just described is typical of the eastbound portion of this service. The westbound portion is identical except that the events happen in reverse. A Toledo crew replaces the Pennsylvania crew at Effner for the run into East Peoria. Again, no brake inspection is made at Effner. The violations of 45 U.S.C. § 9 alleged by the Government arise from the failure to make brake inspections at Effner.

Under 45 U.S.C. § 9, Congress instructed the Interstate Commerce Commission to

"* * * adopt and put into effect the rules, standards, and instructions of the Association of American Railroads * * * for the installation, inspection, maintenance and repair of all power or train brakes for common carriers engaged in interstate commerce by railroad."

This same section then empowered the Interstate Commerce Commission to change these regulations, after hearing. But the section then adds the following proviso:

"Provided, however, That such rules or standards or instructions or changes therein shall be promulgated solely for the purpose of achieving safety."

 Acting in accordance with the Congressional mandate, the Interstate Commerce Commission adopted the rules of the American Association of Railroads for the inspection of train brakes. These regulations appear in 49 C.F.R., beginning at § 132.10. The regulation which is most directly applicable to these cases is 49 C.F.R. § 132.12, which *inter alia* defines a particular inspection procedure known as the "initial terminal road train air brake tests." The parties have stipulated that these tests were not performed at Effner. The regulation provides that these tests must be performed

" * * * at points: (1) Where a train is originally made up (Initial Terminal); (2) Where train consist is changed other than by adding or removing a solid block of cars and train brake system remains charged; (3) Where train is received in interchange."

Neither of the events specified in items (1) and (2) of this regulation occur at Effner. The parties agree that the sole question presented by these cases is whether Effner, which is the point where these trains cross the corporate boundary and where crews of one railroad replace crews of the other, but where no other change to the train takes place, is the point where the trains are "received in interchange" for the purpose of the above regulation requiring inspection of brakes. The Court finds that Effner is the point where the trains are "received in interchange." Failure to make the brake inspections required by 49 C.F.R. § 132.12 at Effner therefore constitutes a violation of 45 U.S.C. § 9.

The Government contends that the corporate boundary has long been under-

stood as the "interchange" point for purposes of the Safety Appliance Acts and that this interpretation is the one best suited to give effect to the Congressional purpose of achieving safety in railroad operations. The railroads contend first that the definition of "interchange" applicable to these cases is the definition given in Rule 7 of the Car Service Rules of the American Association of Railroads. This rule provides in essence that the parties may designate the point of interchange by agreement. The railroad defendants in these cases contend that they have designated East Peoria as the point of interchange on westbound trains and Logansport as the point of interchange on eastbound trains. The railroads contend second that the corporate boundary is only a fiction used for accounting purposes, and designation of that point as the point of interchange would lead to results not consistent with the legislative purpose of achieving safety. The railroads contend finally that if 45 U.S.C. § 9 does require an inspection at the corporate boundary, the statute is so arbitrary and unreasonable that it deprives the defendants of property without due process of law in the instant case.

Historically, the Safety Appliance Acts have been interpreted as attaching great significance to the corporate boundary. 45 U.S.C. § 3 makes it lawful for a railroad to refuse, under certain circumstances, cars which are delivered to it "from connecting lines" without proper brakes. 45 U.S.C. § 13 complements this section by making it unlawful for a railroad to haul a defective car upon its lines. A proviso in 45 U.S.C. § 13 permits a railroad to haul a defective car from the point where the defect is discovered to the first available repair point, but this proviso is applicable *only* where

"such equipment shall have become defective or insecure while such car was being used by such carrier upon its line of railroad * * *."

 This section has consistently been interpreted to mean that a carrier may not receive an already defective car from another carrier and haul it to the

nearest available repair point. United States v. Houston Belt & Terminal Railway Co., 210 F.2d 421 (5th Cir. 1954); United States v. Atchison, Topeka & Santa Fe Railway Co., 156 F.2d 457 (9th Cir. 1946); Baltimore and O.S.W.R. Co. v. United States, 242 F. 420 (6th Cir. 1917); United States v. Denver & Rio Grande Western Railroad Co., 175 F. Supp. 662 (D.Utah 1959), app. dism. 274 F.2d 828 (10th Cir. 1959). As was pointed out in Baltimore and O.S.W.R. Co. v. United States, supra, this necessarily means that the receiving carrier has a duty to inspect the car at the corporate boundary in order to determine whether the car has any defects which would necessitate refusal of the car. The court said:

"Such construction, emphasizing the necessity for vigilant examination of cars at interchange points and placing the responsibility for repairs upon the carrier upon whose line they became defective, is, as we view it, in its tendency to prevent the interchange of defective cars, in direct furtherance of the remedial and humanitarian purposes of the Safety Appliance Acts." 242 F. at 425.

Thus, as early as 1917, the corporate boundary was recognized as an interchange point for the purpose of inspecting cars for defects.

■ This principle that a defective car may not cross a corporate boundary has been applied even where application to the particular case would seem to frustrate the legislative purpose. In United States v. Denver & Rio Grande Western Railroad Co., supra, Union Pacific delivered a defective car to the defendant Denver. Denver discovered the defect, detached the car, and moved it to Denver's repair yard, which was nearby. Repairing the car on the spot would have been dangerous, and the nearest Union Pacific repair yard was five miles away. The court recognized that requiring Denver to refuse the car in some respects frustrated the legislative purpose, but nevertheless held that the statute did not permit Denver to move the car even for repairs because the defect did not develop while the car was on Denver's lines. The court said,

"* * * It is not for the Court to weigh Congressional wisdom in this respect, as the power of Congress to pass the acts is beyond question." 175 F.Supp. at 665.

■■ In view of this well-established Congressional policy of attaching importance to the corporate boundary as the place beyond which a defective car may not pass, the court finds that the legislative scheme is best given effect by interpreting 49 C.F.R. § 132.12 as requiring an inspection of brakes at the corporate boundary.[1] This is a logical extension of the principle that defective cars may not cross the corporate boundary. Whether or not the safety measure of an inspection at the corporate boundary is needed in this particular case is not for this court to determine. United States v. Seaboard Air Line Railroad Co., 361 U.S. 78, 80 S.Ct. 12, 4 L.Ed.2d 25 (1959).

The defendants argue that if Toledo and Pennsylvania were to grant each other reciprocal trackage rights or were

1. In a declaratory order entered March 24, 1965, the Interstate Commerce Commission held, *inter alia*, that
 "The boundary between carriers is the place where the train is received in interchange under 49 C.F.R. § 132.-12 because at that point the use or haul on the line of one carrier ceases and the use or haul on the line of the other carrier commences. * * *"
The Commission also held that
 "The parties may not nullify any part of the Safety Appliance Acts by agreement. Any such agreement in conflict with the requirements of such Acts is without effect."
Under certain circumstances, the interpretation of a regulation by the agency charged with its enforcement may be an aid to interpretation. In this case, the court has considered the declaratory order, but has attached no great significance to it. Norfolk and Western Railway Co., et al., In the Matter of Petitions for a Declaratory Order, No. 34531.

to merge, the inspections specified in 49 C.F.R. § 132.12 would no longer be required at Effner. This demonstrates only that if the corporate boundary were somehow eliminated, there would no longer be an "interchange" at Effner. That does not change the fact that so long as there is a corporate boundary at Effner, Congress has chosen to attach significance to it. It may or may not be true that the corporate boundary no longer has any real significance from a safety standpoint. But within the limits of due process which are discussed below, that is not a matter for this court to consider.

The defendants contend that historically the corporate boundary was a point of great significance from the standpoint of safety, but that in recent years it has become more and more common for trains to cross corporate boundaries with no changes other than crew. Therefore, the defendants contend, it is not consistent with modern railroading to interpret "interchange" as occurring at the corporate boundary. The history of the word "interchange" as it appeared in the rules of the Association of American Railroads is contrary to the defendant's position.

According to pages 10 and 11 of the stipulation, the brake inspection rules of the Association of American Railroads did not use the word "interchange" from 1925 to 1953. During that period, inspections were required "at a point where motive power or engine crew or train crew is changed." In 1953 the rule was changed to require certain tests at the point where the train was made up or where "a railroad receives a train in interchange." It is noteworthy that the requirement of an inspection where car movements occurred was established separately from the requirement of an inspection where a train passed from the dominion of one railroad into the dominion of another. No authority or other indication has been presented to this court that the concept of interchange ever involved a change in the makeup of the train. The rule in its present form was adopted in 1957. This rule specified clearly two circumstances under which car movements would necessitate an initial terminal road train air brake test, namely, where the train was made up and where train consist was changed other than in a definitely described manner. The fact that the Association of American Railroads added a third circumstance called "interchange" under which these tests would be required, but did not specify any particular car movements in relation to this third circumstance, strongly indicates that the concept of interchange did not, in the view of the Association of American Railroads, bear any relation to changes in the composition of trains. In other words, the use by the Association of American Railroads of the concept of "interchange" as a circumstance requiring inspection of train brakes cannot be explained on the ground that an interchange normally involved a change in train consist. Thus, the fact that train consist is not changed at the corporate boundary is no indication whatever that the corporate boundary is not an "interchange" point.

In this connection it is noted that the court in Baltimore and O.S.W.R. Co. v. United States, supra, speaking in 1917, was well aware of the possibility that crossing a corporate boundary may not involve a change in train consist. The court in that case took pains to point out, at 242 F. 425, that disconnecting a defective car from a train in order to redeliver it for repairs would not be a violation of what is now 45 U.S.C. § 13. The court's dictum may or may not have been correct. Compare United States v. Atchison, Topeka and Santa Fe Railway Co., 156 F.2d 457 (9th Cir. 1946). The point is that as early as 1917 a court found a duty to inspect at a corporate boundary in spite of the possibility that train consist might remain unchanged at the corporate boundary. Thus, even if, as defendants contend, breaks in train consist are much less frequent at corpor-

ate boundaries than they used to be, that fact bears little, if any, relation to the duty to inspect at the corporate boundary.

The defendants contend that the definition of "interchange" which should be applied in interpreting 49 C.F.R. § 132.13 is found in Rule 7 of the Car Service Rules of the Association of American Railroads. The parties have provided a copy of this rule as Exhibit 6 attached to the stipulation. In essence, this rule provides that the parties may designate the point of interchange by agreement. Exhibit 5, attached to the stipulation, purports to be an agreement between the defendants designating Logansport as the point of interchange for inspection of cars on eastbound trains and East Peoria as the point of interchange for inspection of cars on westbound trains. This agreement is of no effect in interpreting 49 C.F.R. § 132.12.

■ The first difficulty with defendants' contention is that it is plainly inconsistent with the legislative scheme. If, for example, East Peoria were the lawful point of inspection on westbound trains, it would be possible to haul a car which became defective on Pennsylvania's lines from Effner to East Peoria over Toledo lines in plain violation of 45 U.S.C. § 13. Wherever possible, various parts of a statute, here the Safety Appliance Acts, should be construed in a manner which is consistent with each other. In this case, 45 U.S.C. § 13 is better given effect by construing 45 U.S.C. § 9 and its regulations as requiring an inspection at Effner.

■ A second difficulty with defendants' contention is that neither the statute nor 49 C.F.R. § 132.12 say anything about the parties being able to agree on an interchange point. The power to designate the interchange point would be equivalent to the power to negate the requirements of the Act because the parties could always designate as the interchange point some point at which

an inspection is already required, such as the place where the train is made up.

■ Thirdly, the fact that Car Service Rule 7 is a rule of the Association of American Railroads does not mean that Congress intended to adopt it. The statute indicates only that Congress intended to adopt the AAR rules for brake inspection. Car Service Rule 7 is not one of those rules. Even if it were assumed, contrary to all available indications, that the Association of American Railroads intended for this rule to apply to brake inspections, that would not mean that Congress intended to adopt the AAR definition as its own, especially where, as here, that definition is contrary to the over-all legislative purpose.

■ Fourthly, the background of Rule 7 of the AAR Car Service Rules indicates that it was not, even in AAR usage, a definition of "interchange" for the purpose of AAR brake inspection rules. It was a definition for the purpose of accounting for the use of cars and for the purpose of agreements between the railroads as to the repair of defective cars. See Southern Railway Co. v. Louisville and Nashville Railroad Co., 185 F.Supp. 645 (W.D.Ky.1960), aff'd 289 F.2d 934 (6th Cir. 1961); Chicago and North Western Railway Co. v. Chicago, Rock Island & Pacific Railroad Co., 179 F.Supp. 33 (N.D.Iowa 1959). Both these purposes are appropriate subjects for agreement between railroads. Congressional brake inspection requirements are manifestly not an appropriate subject for agreement between railroads.

Finally, the legislative history of 45 U.S.C. § 9 is contrary to defendants' contention that they should be entitled to establish by agreement the point where the train is "received in interchange." House Report No. 1205, 85th Cong., 2nd Sess., 2 U.S.Code Cong. and Adm.News, p. 2343 (1958) indicates a Congressional concern that the railroads were either unwilling or unable to enforce their own regulations for brake inspection. The Act of 1958 simply gave the railroad in-

dustry's own regulations the force of law. It would defeat the legislative purpose to interpret the regulations in such a way that the railroads could, by agreement, nullify the requirement which the Congress had imposed. See United States v. Indiana Harbor Belt Railroad Co., 224 F.Supp. 219 (N.D.Ind.1963).

The defendants contend that the construction of 49 C.F.R. § 132.12 urged by the Government does not serve the Congressional purpose of achieving safety and must therefore be erroneous. The defendants point to a number of results which the defendants characterize as "absurd." They point out that Pennsylvania could move an identical train between East Peoria and Logansport over its own lines, a much greater distance than the present operation, without making any brake inspections en route. They point out that Pennsylvania commonly operates trains over much greater distances and over more difficult terrain than are involved in the present operation, again without making any brake inspections en route. They point to various car movements, none of which occur at Effner, which may be performed without the initial terminal road train air brake tests described in 49 C.F.R. § 132.-12. On the basis of these facts, the defendants contend that the Government's construction of 49 C.F.R. § 132.12 does not achieve safety. The defendants' contention must be rejected.

First of all, the defendants have not shown how their construction, which would require an inspection at the destination, achieves safety any better than the Government's construction. If anything, the defendants' construction serves safety less. The protection afforded the operation between Effner and the destination would be lost if defendants' construction were accepted, but no protection would be gained as an inspection must take place in any event when the cars are reassembled into other trains.

The second difficulty with the defendants' contention is that nothing in the statute requires that the Government's construction be "for the purpose of achieving safety." The defendants apparently rely on a proviso in 45 U.S.C. § 9 which says that "rules or standards or instructions or changes therein shall be promulgated solely for the purpose of achieving safety." The defendants do not challenge the original promulgation of 49 C.F.R. § 132.12; nor could they, as Congress ordered its promulgation. So this statutory prerequisite need be met only if the Government's interpretation of the regulation amounts to a "change." As was discussed above, a definition of "interchange" as occurring at the corporate boundary is consistent with Congressional policy established long before the enactment of 45 U.S.C. § 9 in 1958. Thus, the Government need not meet the statutory prerequisite that its interpretation be "for the purpose of achieving safety."

Finally, even if the statutory prerequisite discussed above were somehow applicable to the Government's construction of 49 C.F.R. § 132.12, the statutory test is easily met. The legislative history of this proviso may be found in House Report 1205, 85th Cong., 2nd Sess., supra. The House Report indicates that a chief objection of the railroads to this legislation was the fear that the motive for the bill was not safety, but, rather, an effort to shorten the length of trains, thereby creating more jobs. The proviso that rules "shall be promulgated solely for the purpose of achieving safety" in 45 U.S.C. § 9 was inserted for the purpose of making it clear that rules and amendments were not to be adopted for the purpose of limiting the length of trains. Thus, this proviso should be interpreted not as requiring that a substantial quantum of safety be achieved by each application of the rule, but only as requiring that the rule not be applied for the purpose of limiting train length. There is no discernible purpose of limiting train length in the requirement of a brake inspection at Effner.

Moreover, in determining whether the application of 49 C.F.R. § 132.12 to require a brake inspection at Effner has the purpose of achieving safety, the supposed "absurdities" indicated by the defendants are completely irrelevant. In determining whether a particular regulation achieves safety, it is entirely beside the point that other operations involving more risk may be conducted without violating the regulation. It is also entirely beside the point that the gain in safety occasioned by the regulation may, as defendants contend, be completely outweighed by the inconvenience occasioned by the regulation. The only relevant question in determining whether a particular regulation achieves safety is whether the operation in question is safer with the application of the regulation than without it. Measured against this test, it is clear that the inspection of brakes at Effner achieves safety. Whether the increase in safety is worth the added inconvenience is not for this court to decide.

The court finds that 45 U.S.C. § 9 and its regulations require a brake inspection at Effner, the corporate boundary between these two railroads. The defendants' final contention is that this statute, so interpreted, amounts to a deprivation of property without due process, in violation of the Fifth Amendment.

The limits of due process, as they relate to Government regulation of private activity, are stated in Nebbia v. People of State of New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934):

"The guaranty of due process * * * demands only that the law shall not be unreasonable, arbitrary, or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained." 291 U.S. at 525, 54 S.Ct. at 511.

It is true, as defendants contend, that the court has a duty to consider the conditions under which a statute is applied in determining whether the statute may have been rendered unconstitutional by changing conditions. Nashville, Chattanooga & St. Louis Railway v. Walters, 294 U.S. 405, 55 S.Ct. 486, 79 L.Ed. 949 (1935). But this does not mean that, where considering a statute of broad general application, the court must engage in piecemeal application of the statute to determine whether each individual application is consistent with the legislative purpose. Such piecemeal consideration would cripple the legislative scheme. The duty of this court is to consider whether the Congressional requirement of a train brake inspection at the corporate boundary between railroads is so unreasonable under modern conditions as to amount to a deprivation of due process. This requirement here under attack is plainly not so unreasonable.

The object sought to be attained by the Safety Appliance Acts is the safety of railroad employees and the traveling public. One of the means which Congress has selected to give effect to this object is a requirement of frequent and periodic inspection of train brakes. No one could seriously contend that this provision for inspection of brakes is not a reasonable means of attaining the object of safety. Nor is it arbitrary and unreasonable for Congress to require initial terminal road train air brake tests at the corporate boundary between railroads in cases where the train consist remains intact and only the crew is changed. The point where a train is "received in interchange" is an easily-determined place and a place which the railroads themselves had originally designated in their rules as an appropriate place to make these inspections. Where these "interchange" points are more than 500 miles apart, more frequent intermediate inspections are required. 49 C.F.R. § 132.12. The over-all result is a requirement of inspections at reasonably frequent intervals in distance in order to assure the proper operation of air brakes and related apparatus, thereby

increasing the safety of railroad operations.

It may or may not be true, as defendants contend, that under the conditions of modern railroading, there is no longer so great a need for periodic train brake tests upon a train which remains intact. Science and technological development may have rendered the Congressional requirements obsolete. But that is for Congress and the Federal Railroad Administration to determine, not for this court. That a system of regulation is obsolete does not necessarily mean it is unconstitutional. There is nothing in the record presented to this court which is so compelling as to require a holding that the Act, or its application to require an inspection at Effner, is so unreasonable as to be a deprivation of property without due process.

The court finds for the plaintiff on its three claims against the defendant Toledo, Peoria & Western Railroad Company and will enter judgment for plaintiff for seven hundred fifty dollars ($750). The court finds for the plaintiff on its two claims against the defendant Pennsylvania Railroad Company and will enter judgment for plaintiff for five hundred dollars ($500). This memorandum contains the court's findings of fact and conclusions of law, pursuant to Rule 52 (a) of the Federal Rules of Civil Procedure.

## JUDGMENT

It is therefore considered, ordered and adjudged that plaintiff in Lafayette Civil Cause No. 378 have and recover of and from the defendant, Toledo, Peoria & Western Railroad Company, judgment in the amount of seven hundred fifty dollars ($750).

It is further ordered, considered and adjudged that plaintiff in Lafayette Civil Cause No. 381 have and recover of and from the defendant, The Pennsylvania Railroad Company, judgment in the amount of five hundred dollars ($500).