**UNITED TRANSPORTATION UNION et al., Plaintiffs,**

**v.**

**UNITED STATES of America et al., Defendants.**

**Civ. A. No. 3501–70.**

United States District Court, District of Columbia.

Jan. 13, 1972.

Lester P. Schoene, Washington, D. C., for plaintiffs.

Stuart E. Schiffer, Department of Justice, Washington, D. C., for defendants.

### OPINION

WILLIAM B. JONES, District Judge.

Following the promulgation of a rule by the Federal Railroad Administration (F.R.A.) on October 22, 1970, effective November 30, 1970, which prescribed certain requirements for inspecting and testing power or train brakes by certain rail carriers, the plaintiffs brought this action seeking to enjoin and set aside the F.R.A. order promulgating the rule. The complaint also requests a declaratory judgment delineating the alleged limited authority of the F.R.A. in rule making with respect to power or train brakes. Plaintiffs and defendants have filed cross-motions for summary judgment which have been briefed and argued.[1]

Prior to 1958 no agency of the Federal Government had authority to promulgate regulations applying to power or train brakes. From at least 1925 the railroads had their own rules, standards and instructions for the installation, inspection, maintenance and repair of such brakes. In 1957 bills were introduced in the House and the Senate of the Congress to confer authority on the Interstate Commerce Commission (I.C.C.) to adopt and put into effect power or train brake rules. After extensive hearings before the Senate and the House Interstate and Foreign Commerce Committees, legislation was reported and enacted by the Congress. That Act of Congress appears in 45 U.S.C. § 9. There it is provided that the Secretary of Transportation[2] should adopt and put into effect the current rules, standards and instructions of the railroads for the installation, inspection, maintenance, and repair of all power or train brakes. The Act further provided that those rules, standards and instructions were to remain in effect unless changed by order of the Secretary; "Provided, however, that such rules or standards or instructions or changes therein shall be promulgated solely for the purpose of achieving safety."

Pursuant to that legislation power or train brake regulations were adopted and appear in 49 C.F.R., Part 232. In 49 C.F.R. 232.12 it is provided that trains must be given brake tests and inspections at points: (1) where a train is originally made up (initial terminal); (2) where a train consist is changed other than by adding or removing a solid block of cars with the train brake system remaining charged; (3) where a train is received in interchange by one railroad from another at the corporate boundary of those railroads. Moreover, each railroad is required to designate intermediate inspection points on its own line within a limit of not to exceed 500 miles where certain brake inspections are to be made.

49 C.F.R., Part 211 sets forth the rulemaking prodecures for F.R.A. And 49 C.F.R. 211.11 provides that any person may petition the Administrator "to is-

---

1. Prior to the filing of their motion for summary judgment, plaintiffs had filed a motion for preliminary injunction. Since this case is now in a condition to be disposed of on the summary judgment cross-motions, it is unnecessary for the Court to act on the preliminary injunction motion.

2. At the time the legislation was enacted in 1958, it was the I.C.C. which was directed to adopt and put those rules, standards and instructions into effect. In 1966 this authority and function was transferred to the Secretary of Transportation under whose direction and control the Federal Railroad Administration acts. 49 U.S.C. § 1655(e) (1) (B).

sue, amend, or repeal a rule, or for a permanent or temporary exemption from any rule." Provision is made for appropriate notice, hearings, and participation by interested persons. 49 C.F.R. Part 211, Subpart C.

Pursuant to its rule-making regulation, F.R.A. in 1970 held formal hearings on eleven petitions filed by railroads seeking exemptions from the regulations requiring that trains be given initial terminal brake inspections and tests at corporate boundaries when a "run-through train" is received in interchange by one railroad from another.[3] Hearings were held in New Orleans, St. Louis and Washington, D. C. Participants in those hearings were the plaintiffs in this action, the Brotherhood of Locomotive Engineers, the petitioning railroads and representatives of the Federal Railroad Administration. An order was entered on June 10, 1970 by the Hearing Examiner which adopted a rule applicable to the petitioning railroads in the New Orleans proceedings. That order provided that the rule was an interim one pending further study and further proceedings. Thereafter all eleven petitions were consolidated for hearing and the St. Louis and Washington, D. C. hearings were held. On October 22, 1970, the Hearing Examiner filed his decision and order which superseded the June 10, 1970 order. The Federal Railroad Administration, acting on plaintiffs' petition for reconsideration, left unchanged the rule promulgated by the October 22, 1970 order but limited its application to the petitioning railroads.

The October 22, 1970 rule requires that personnel, trained and qualified to inspect, test and repair cars, make the initial terminal and the intermediate (500 miles) tests and inspections of train brakes at points where adequate car repair facilities are available. If the point of actual interchange (corporate bound-

ary) of a train from one railroad to another is different from that where the initial terminal test is made, the receiving railroad must make a test and inspection to determine that brake pipe leakage does not exceed 5 pounds per minute and that the brakes apply and release on the rear car from a 20 pound service brake pipe reduction. The initial terminal and intermediate (500 miles) tests must be certified on a form prescribed by F.R.A. The false execution of the certificate is made an offense under 18 U.S.C. 1001. The rule specifically provides that it does not relieve the delivering and receiving railroads in the interchange of a train from the provisions of the Safety Appliance Acts pertaining to the moving of defective equipment.

The October 22, 1970 order provided that the rule promulgated remains subject to additional requirements as shown to be warranted in the interest of safety. The Hearing Examiner retained jurisdiction for a period of one year from November 30, 1970, the effective date of the order.

Plaintiffs attack the October 22, 1970 rule as being in excess of the delegated power to the F.R.A. and in violation of the Power or Train Brakes Safety Appliance Act of 1958 (45 U.S.C. § 9). They argue that the promulgated rule not only did not make train operations safer but that it had for its purpose the promotion of efficient and economical railroad operation. In short, according to plaintiffs, what the F.R.A. has attempted here is to enact legislation, under the guise of its rule-making power, which would alter and subvert the Power Brake Act in disregard of Congressional limitation on the agency. According to the plaintiffs, this limitation is to be found in the proviso in the Act which authorizes changes in the brake testing and inspection regulation "solely for the purpose of achieving safety."

---

3. The F.R.A. Hearing Examiner, in his October 22, 1970, final decision, defined "run-through trains" as trains consisting of cars which have received a certified initial terminal inspection and test, passing through a corporate boundary or terminal area with no change in consist except the cutting off or the adding of a block of cars. Cars added must also have had the certified initial test.

There can be no question that the petitioning railroads, in seeking a change from the interchange inspection requirement, were concerned with the economical operation of their run-through trains in order to better their competitive position in the transportation industry. The Hearing Examiner in his October 22, 1970 decision recognized that interest on the part of the railroads. However, as is evident from his decision and findings, the Hearing Examiner centered his attention on the question of safety in promulgating the October 22, 1970 rule.

During the course of the consolidated hearing, the Hearing Examiner heard testimony of a number of witnesses. From that testimony and the inspection reports which he considered, he found that the quality of the inspections and tests being given at the initial terminals was not up to the desired level on all trains. In some instances he found that the quality of the inspections and tests was good, while in other cases it was not. He heard testimony that "corn field" inspections, where qualified personnel and adequate car repair facilities were not available, did not benefit safety. While not uncontradicted, other testimony was to the effect that given a high quality brake testing and inspection at the initial terminal a train did not need a terminal type of inspection and testing at an interchange point. In that connection the Hearing Examiner pointed out that, under the 1958 rules, a train traveling on the line of one railroad, after having had the initial terminal inspection and testing, could travel a great distance with crew changes enroute without further inspection and testing, while another train, having had the initial terminal inspection and testing, would need another inspection and testing at an interchange point even if the distance traveled from the initial terminal was but a few miles.

Moreover, as the Hearing Examiner noted, railroad mergers in recent years have eliminated numerous corporate boundaries and, thus those interchange points where prior to such mergers train brake inspection and testing had been required.

As a result of the rule-making proceedings, the Hearing Examiner concluded that train operation safety would be increased by a rule, together with its strict enforcement, that required high quality inspection and testing of brakes at initial terminals and at intermediate (500 miles) points by qualified personnel where adequate car repair facilities were available. Such were the terms of the October 22, 1970 rule, which also eliminated the requirement of the initial terminal type inspection and testing at interchange points.

The fact that the proceedings were initiated by the railroads for economic reasons and that safety considerations were brought forward later does not undermine the bona fides or legal effect of the Hearing Examiner's findings. Nor do the incidental economic and competitive benefits accruing to the railroads through the promulgation of the 1970 rule furthering safety give cause for setting the rule aside as being in violation of the 1958 Act. When the legislation was under consideration in Congress the railroads expressed concern that the authority proposed to be conferred on the I.C.C.[4] would be used to adopt regulations limiting the length of trains and thus adversely affect the railroads in the economic sense. To make certain that there would be no such use of the legislation, the bill was amended to provide that the brake inspection and testing rules, or any changes in them, were to be "promulgated solely for the purpose of achieving safety." It was expressly so stated in the House Report (H.Rep.No.1205, Aug. 20, 1957, 85th Cong. 2nd Sess.):

> The purpose of including such language is to make clear that these rules are for the purpose of safety, and not for the purpose of limiting the length of trains. The relationship of train

---

4. See n. 2, *supra*.

length to safety is a matter for separate consideration. U.S.Code Cong. & Admin.News, p. 2345.

When the bill was reported to the House the extensive debate made clear that the proviso was intended to make certain that in any rule-making there would be no limitation on the length of trains. 104 Cong.Rec. 6133–6140 (April 2, 1958). There is nothing in the Report or the debate which justifies plaintiffs' interpretation of the legislation as proscribing a rule which, while advancing train operation safety incidentally renders an economic benefit to the railroads.

Consistent with that interpretation is that of the United States District Court for the Northern District of Indiana in United States v. Toledo, Peoria and Western R.R., 280 F.Supp. 243, 250, 251 (1968), where it was stated:

> * * * The House Report indicates that a chief objection of the railroads to this legislation was the fear that the motive for the bill was not safety, but, rather, an effort to shorten the length of trains, thereby creating more jobs. The proviso that rules 'shall be promulgated solely for the purpose of achieving safety' in 45 U.S.C. § 9 was inserted for the purpose of making it clear that rules and amendments were not to be adopted for the purpose of limiting the length of trains. Thus, this proviso should be interpreted not as requiring that a substantial quantum of safety be achieved by each application of the rule, but only as requiring that the rule not be applied for the purpose of limiting train length. * * *

> * * * The only relevant question in determining whether a particular regulation achieves safety is whether the operation in question is safer with the application of the regulation than without it. * * *

That court, in applying the 1958 brake inspection and testing rules then in effect, ruled that the interchange inspection was required, but in doing so recognized that that requirement could be eliminated as being obsolete by either the Congress or by the Federal Railroad Administration. 280 F.Supp. at 252.

Prior to the transfer of jurisdiction over the regulation of train brakes from the Interstate Commerce Commission to the Federal Railroad Administration,[5] the Commission had occasion to interpret the proviso in the Power or Train Brake Safety Appliance Act of 1958. Docket No. 32406, 329 I.C.C. 442 (1967). In that proceeding the Association of American Railroads petitioned for an amendment to 49 C.F.R. 232.13(e) to permit transfer trains and yard trains to be moved for a distance of up to 30 miles instead of the 20 mile maximum movement provided in the rule, together with changes in the rule that would relax the requirements of brake testing and inspection in the case of such movements. The Commission observed that Congress had inserted the proviso in the Act to assure the railroads that the legislation would not be used as an instrument to affect them in an adverse economic manner. And the Commission stated: "Since the proviso was inserted in the legislation for the protection of the carriers, it does not follow logically that the carriers themselves cannot seek to realize economies by attempting to change the rules, standards and instructions— assuming, of course, that safety, though not necessarily improved, is not diminished, or is maintained." 329 I.C.C. at 445. Because the railroads did not prove in that proceeding that safety would be maintained by the economies or efficiencies sought to be realized, the petition was denied.

Before its 1967 interpretation, the Commission had ruled that the proviso in the 1958 Act required a showing that safety would be improved or achieved before the brake testing and inspection rule could be relaxed or modified; that relief from the 1958 rules could not be granted on a mere showing that existing

5. See n. 2, *supra.*

safety would be maintained or that operating conveniences or economies would result. See Docket No. 32406, 306 I.C.C. 775, 310 I.C.C. 420. Plaintiffs contend that those prior interpretations are correct and that their reversal in 1967 should be rejected. But their argument in support of that position is irrelevant because here the Hearing Examiner has made an express finding that the October 22, 1970 rule "would increase the safety" of railroad operations. (October 22, 1970 Decision, pp. 13–14.) Thus, in this case it would not matter if the Commission's 1967 interpretation was held to be erroneous.

Plaintiffs reject the Hearing Examiner's finding that the new rule "would increase safety." They contend that it is the duty of this Court to weigh the evidence and, thus, evaluate the record made at the consolidated hearings in order to determine for itself whether that rule is in accordance "with the mandate of Congress." As has been heretofore stated, this Court finds without merit plaintiffs' contention that the Power or Train Brake Safety Appliance Act does not permit the adoption of a rule by F.R.A. which, while increasing train operation safety, incidentally renders economic benefit to railroads.

■ The rule and decision of the F.R.A. which are the subject matter of this litigation, are the result of that agency's rule-making proceeding. This Court's scope of review is limited to determining whether the rule is reasonably adopted to carry out the purposes of the Power or Train Brake Safety Appliance Act of 1958. American Trucking Assns. v. United States, 344 U.S. 298, 314, 319–320, 73 S.Ct. 307, 97 L.Ed. 337 (1953). In Regular Common Carrier Conf. v. United States, 307 F.Supp. 941 at 943 (1969), this Court stated: "In the usual case, court review of a rule making proceeding is limited to the inquiry whether the agency abused its discretion, acted in excess of its delegated powers or failed to comply with procedural requirements."

Here the hearings prescribed by the Power or Train Brake Safety Appliance Act of 1958 were accorded the interested parties. In fact the character of those hearings went beyond the requirements of a rule-making proceeding type of hearing. The Hearing Examiner permitted the parties to call witnesses to testify as well as to present documentary evidence. Moreover, the parties were allowed to cross-examine the witnesses.

But even in the case of agency adjudications, the scope of this Court's review is narrowly limited. "Even though the Court might reach a different conclusion on the facts presented, the Commission's order should not be set aside if it is not arbitrary or capricious or unlawful, and if the findings are adequate and supported by substantial evidence." National Motor Freight Traffic Ass'n. v. United States, 242 F.Supp. 601, 604 (D.D.C.1965). And this Court has stated that, where questions of law are involved, it gives "considerable weight to the Commission's rulings and upholds them where it finds a reasonable basis for its conclusions." Benson v. United States, 175 F.Supp. 264, 267 (D.D.C. 1959).

■ At the consolidated hearings there was conflicting evidence as to whether safety would be increased through the required brake inspection and testing by qualified personnel at initial terminal and intermediate (500 miles) points where there were adequate car repair facilities without additional inspection and testing at interchange (corporate boundary) points. But such a conflict does not preclude the Hearing Examiner from making the finding he did make that the new rule advances safety. There was competent evidence supporting that finding. In this case it is not for this Court to determine "[w]hether or not the safety measure of an inspection at the corporate boundary is needed * * *". United States v. Toledo, Peoria and Western R. R., 280 F. Supp. 243, 247 (N.D.Ind.1968).

■ As a further contention for setting aside the October 22, 1970 rule-

making order, plaintiffs assert that, by eliminating the interchange (corporate boundary) brake inspection and testing, trains having defective equipment, not related to brakes, will be turned over to receiving railroads. But the October 22, 1970 rule specifically provides that it does not relieve the railroads of the Safety Appliance Acts (45 U.S.C. § 13) requirement that one railroad may not deliver nor another railroad receive defective equipment at a corporate boundary. And the new rule does not affect the right of the F.R.A., Bureau of Railroad Safety to inspect a train at an interchange point and detect such defects. P. 12, Hearing Examiner's Decision, October 22, 1970. The new rule applies only to brake inspection and testing of run-through trains and as to that the Hearing Examiner has found the rule will increase safety.

Plaintiffs have filed a motion to require the F.R.A. to file with the Court "the complete and correct administrative record in this case." At the time the Court heard argument of counsel on the cross-motions for summary judgment, the Court stated it would take this motion under advisement. From the plaintiffs' memorandum in support of the motion and defendants' memorandum in opposition thereto and the record in this case, it appears that defendants at the time they filed their motion for summary judgment filed the certified record of the evidence received at the consolidated hearings before the Hearing Examiner. Except for some immaterial duplication of the numbering of pages of the certified record, plaintiffs' complaint is that there has not been filed with this Court certain train inspection records made and kept in the regular course of business of the F.R.A., as well as certain summaries of those records made by or at the request of the Hearing Examiner. But the rule challenged here is the result of a rule-making pro-

ceeding and in formulating that rule the Hearing Examiner and the F.R.A. were not limited to the hearing record. In Pacific Coast European Conf. v. United States, 350 F.2d 197, 205 (C.A.9 1965) cert. denied, 382 U.S. 958, 86 S.Ct. 433, 15 L.Ed.2d 362, it was stated:

> It is apparent that in rule making hearings the purpose is to permit the agency to educate itself and not to allow interested parties to choose the issues or narrow the scope of the proceedings. * * *. The agency, in rule making, can look beyond the particular hearing record since it otherwise would be unable to draw from its expertise.

Plaintiffs' motion to complete the record is denied.

Defendants' motion for summary judgment is granted; plaintiffs' motion for summary judgment is denied.

GESELL, J., concurs.

J. SKELLY WRIGHT, Circuit Judge (dissenting):

I regret my inability to agree with my colleagues in this case. In my judgment the order of the Federal Railroad Administration granting the petitioning railroads an exemption from complying with the safety regulations, specifically 49 C.F.R. § 232.12 (1971), which Congress ordered the agency to adopt in the Power or Train Brakes Safety Appliance Act of 1958, 45 U.S.C. § 9 (1970), should be vacated for three separate reasons.

1. The Power or Train Brakes Safety Appliance Act does not authorize the agency to grant to particular railroads exemptions from the regulations the Act required the Interstate Commerce Commission[1] to adopt and apply to all railroads. The Act did authorize the agency to change the regulations after appro-

---

[1]. The functions of the ICC under 45 U.S.C. § 9 (1970) were transferred to the Department of Transportation on October 15, 1966. 49 U.S.C. § 1655(e) (1) (B) (1970). The Federal Railroad Administration (FRA) is part of that Department.

priate hearing, provided the changes were "solely for the purpose of achieving safety." But here the agency did not change the regulations. It simply allowed certain railroads exemption from the regulations' interchange [2] inspection and brake testing requirements.

Even if we assume that the statute somehow granted the agency the unspoken right to grant exemptions to some, but not all, railroads from some of the regulations, the order in this case would still be invalid for due process defects in its promulgation. Recently the agency did promulgate a regulation [3] asserting the right to grant exemptions from the rules, but it provided no guidelines whatever as to the basis on which exemptions would be granted. The result is that in this case an exemption has been granted to certain petitioning railroads on grounds equally applicable to all railroads. It is true that the agency is now engaged in rule making which has as its purpose the extension of the exemption into a regulation covering all railroads. In the meantime, however, only the railroads in suit here enjoy relief from the detailed interchange inspection requirements provided by the regulations.

It is elementary due process doctrine that equals cannot be treated unequally, that a smaller class cannot be carved out of a larger class and given special treatment when all members of the larger class are identical in all pertinent respects. If there were some basis for relaxing the safety regulations as to the petitioning railroads not applicable to all railroads, that basis should be spelled out in the agency's opinion. But on the contrary, the agency opinion granting the exemption to the petitioning railroads makes clear that the petitioning railroads are in the identical position with reference to the interchange inspection requirements of the regulations as is the balance of the railroad industry.

2. The exemption granted the petitioning railroads from complying with the interchange inspection requirements of the regulations is an invitation, if not a license, for them to violate 45 U.S.C. § 13 (1970). That section makes it unlawful for a railroad to accept and haul a defective car on its lines for any purpose.[4] The regulation from which the petitioning railroads are exempted under the agency order, 49 C.F.R. § 232.12, was intended to implement 45 U.S.C. § 13 by requiring brake inspection and testing at interchange. The agency itself has so ruled. In its declaratory order, granted in 1965 on petition of the Norfolk & Western, Lehigh Valley, and Alton & Southern Railroads requesting an interpretation of the specific regulation in suit here, 49 C.F.R. § 232.12, the ICC stated:

" 'It [the rule] requires each railroad to discover and repair or reject cars received from other carriers in defective condition since a carrier may not lawfully haul or use a car with a defective safety appliance, including power brakes, on its line of railroad when the defect had occurred on the line of another carrier.' 30 Federal Register 4063."

United States v. Akron, Canton & Youngstown R. Co., 6 Cir., 397 F.2d 139, 141 (1968).

Under the exemption from 49 C.F.R. § 232.12 granted here, the petitioning railroads will no longer be required to discover and repair car brakes at interchange or reject those cars with defective brakes. The inevitable result will be, of course, that cars with defective brakes will be accepted and run on the petitioning railroads' lines in violation of 45 U.S.C. § 13, at least until the 500-mile inspection provided in the agency order. When Congress, in the Power or Train Brakes Safety Appliance Act of 1958, required the agency to adopt 49 C.F.R.

---

2. The interchange is the point where one carrier delivers railroad cars to another carrier at the carriers' corporate boundary.

3. 49 C.F.R. § 211.11 (1971).

4. See United States v. Akron, Canton & Youngstown R. Co., 6 Cir., 397 F.2d 139 (1968).

§ 232.12, it was obviously aware of the prohibition of 49 U.S.C. § 13. By requiring an inspection *before* a car was accepted, it implemented that prohibition. Under the circumstances it is difficult for me to believe that Congress intended to authorize the agency to destroy the statutory scheme by granting some railroads an exemption from 49 C.F.R. § 232.12.[5]

3. The exemption granted the petitioning railroads from compliance with 49 C.F.R. § 232.12 is in the teeth of the proviso of 45 U.S.C. § 9 which permits the agency to change the regulations the statute required it to adopt "solely for the purpose of achieving safety." In spite of the fact that the agency's authority to change regulations was plainly so limited, the hearing examiner here relied primarily on a prior agency ruling interpreting the proviso otherwise. In that ruling the agency, then the ICC, held:

> "Since the proviso was inserted in the legislation for the protection of the carriers, it does not follow logically that the carriers themselves cannot seek to realize economies by attempting to change the rules, standards and instructions—assuming, of course, that safety, though not necessarily improved, is not diminished, or is maintained."

Rules for Inspection of Power or Train Brakes, 329 I.C.C. 442, 445 (1967). In the same order the Commission went on to say:

> "We find that the interpretation previously placed by us upon the proviso is inaccurate for the reasons stated and our prior findings are modified accordingly."

*Ibid.*

As indicated in the ICC's ruling, up to that time it had been interpreting the proviso to mean what it said. As late as March 26, 1965, in a declaratory order

the ICC gave the following answer to the following question:

> "*Question.* Does the Commission have the authority and duty under 45 U.S.C. 9 to rescind or change any provisions of 49 CFR 232.12 which has no relation to safety?

> "*Answer.* The Power or Train Brakes Safety Appliance Act of 1958 specifically provides that the Interstate Commerce Commission has authority to change the rules, standards and instructions referred to therein only when such change is promulgated for the sole purpose of achieving safety."

United States v. Akron, Canton & Youngstown R. Co., *supra*, 397 F.2d at 142 n. 1. (Italics in original.) After that ruling, what made the Commission suddenly find that the proviso after all did not mean what it so plainly said is not entirely clear. Primary reliance for the change is predicated on the legislative history of the Power or Train Brakes Safety Appliance Act, which legislative history I assume was available to the Commission ever since the Act was passed. It seems the Commission came to believe that the proviso, instead of being "solely for the purpose of achieving safety," really was placed in the statute solely for the purpose of preventing the Commission from limiting the length of trains.

I suggest that if not limiting the length of trains was the sole purpose of the proviso, Congress would have said just that in the statute. Instead Congress used language in the proviso completely consistent[6] with the basic safety purpose of the legislation and used words that even a third grade reader can easily understand. Under the circumstances, why at this late date the agency resorted to legislative history to reverse itself is not apparent. Moreover, the

---

5. *See* Peters v. Hobby, 349 U.S. 331, 345, 75 S.Ct. 790, 99 L.Ed. 1129 (1955); F.C.C. v. American Broadcasting Co., 347 U.S. 284, 296, 74 S.Ct. 593, 98 L.Ed. 699 (1954); Miller v. United States, 294 U.S. 435, 439–440, 55 S.Ct. 440, 79 L.Ed. 977 (1935).

6. Actually the plain language of the proviso is totally inconsistent with the agency's newly found interpretation. This record makes clear that a train may be unsafe because of its excessive length, so limiting rather than not limiting train length may indeed serve a safety purpose.

legislative history is hardly as clear as the proviso itself. Indeed it can more easily be read as supporting the unmistakable language of the proviso rather than the Commission's lately contrived tortured interpretation.[7]

The fact is that, admittedly, at least some of the petitioning railroads had been simply ignoring 49 C.F.R. § 232.12 with the tacit approval of the ICC, and the FRA inspectors, the new boys on the block, had threatened to invoke the penal provisions of 45 U.S.C. § 13 against them. Hence the petitions for exemptions. Even in the petitions the railroads admit that exemption is sought for reasons of economy and efficiency. Any allegations about "solely for the purpose of achieving safety" in some of the petitions and in the agency's ruling here are obviously unsupported armor-plate designed to conform to the language of the proviso.

On this record the hearing examiner here realized it would be simply irrational to hold that the exemption was granted "solely for the purpose of achieving safety." So he applied the statute as lately revised by the ICC rather than as passed by Congress. In so doing, I submit, he erred.[8] If the railroads want to be relieved of the burden of the safety proviso in the statute, they should take their case to Congress.

I respectfully dissent.

---

7. The Senate Commerce Committee held extensive hearings on the legislation and recognized in its report that the legislation was proposed "to achieve safety and for no other purpose." The Committee report stated, in pertinent part:

> "The fear has been expressed that the rules and regulations for power brakes authorized by S. 1386 might be used to limit train length for economic rather than safety reasons. Such is not the intent of this bill. Its terms are to be administered, if they become law, to achieve safety and for no other purpose."

S.Rep.No.568, 85th Cong., 1st Sess., at 18 (1957).

The debate in the House of Representatives also supports the conclusion that the Power or Train Brakes Safety Appliance Act was enacted solely for the purpose of safety and nothing else. A floor manager of the bill, Congressman Madden, in discussing H.R. 5124, the companion bill to S. 1386, on the floor of the House, stated: "I can assure the Members that this bill concerns the safety of brakes on railroad cars and nothing else." 104 Cong.Rec. (Part 5) 6133 (1958). Another floor manager, Congressman Harris, stated "that this measure, as amended, is necessary for the improvement of railroad safety. That it properly is directed solely at the matter of safety * * *." Id. at 6136.

8. See cases cited in note 5 supra.