**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**STAUFFER CHEMICAL COMPANY,**
**Defendant-Appellant.**

**No. 81–5311.**

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 17, 1981.

Decided July 7, 1982.

Opinion on Denial of Rehearing
Oct. 15, 1982.

Charles F. Lettow, Eric C. Jeffrey, Cleary, Gottlieb, Steen & Hamilton, Washington, D. C., Robert J. Walker, Leigh W. Davidson, Bass, Berry & Sims, Nashville, Tenn., for defendant-appellant.

Hal D. Hardin, U. S. Atty., Nashville, Tenn., Judson W. Starr, Pollution Control Section—P.O. 7415 Land and Natural Resources Div. U. S. Dept. of Justice, Washington, D. C., John H. Johnson, Jr., Regional Counsel, U. S. E.P.A. Region–IV, Atlanta, Ga., for plaintiff-appellee.

Before WEICK,* Senior Circuit Judge, JONES, Circuit Judge and SILER,** District Judge.

WEICK, Senior Circuit Judge.

Stauffer has appealed to this court from an order of the district court denying its motion to quash an invalid administrative search warrant issued ex parte by a United States Magistrate, which authorized EPA to conduct an air pollution inspection of private commercial property belonging to Stauffer, namely, its plant located at Mt. Pleasant, Tennessee, said inspection to be made not only by authorized employees of EPA and the State of Tennessee, but also by unauthorized private contractors objected to by Stauffer to protect it from disclosure of its trade secrets or other proprietary information to competitors or others with a conflict of interest. Stauffer refused to permit the inspection to include the employees of private contractors unless such private contractors signed a nondisclosure agreement to protect Stauffer against disclosure by private contractors of Stauffer's trade secrets. The private contractors refused to execute the nondisclosure agreements prepared by Stauffer and Stauffer

---

* Judge Weick became a Senior Circuit Judge at the close of business on December 31, 1981.

** Honorable Eugene E. Siler, Jr., Judge, United States District Court for the Eastern and Western Districts of Kentucky, sitting by designation.

refused to permit the inspection of its property. EPA cited Stauffer with contempt of court for refusing the inspection. Stauffer then filed its motion to quash. The contempt citation and motion to quash were heard together by the district judge. He denied the motion to quash holding that the phrase "authorized representative" of the Administrator, as used in Section 114(a)(2) of the Clean Air Act, 42 U.S.C. § 7414(a)(2)[1] authorizes the EPA to use employees of private contractors in making such inspections and that Stauffer was required to comply with the warrant. He dismissed the contempt citation holding that "[b]ecause Stauffer legitimately believed that private contractors were not authorized representatives under the Clean Air Act, EPA's motion for contempt is denied. If Stauffer's subsequently refuses entry to its Mt. Pleasant plant to authorized representatives of the Administrator presenting proper credentials and a warrant, a contempt citation shall issue." This constituted a final appealable order.

The opinion of the district court in the present case is reported in *United States v. Stauffer Chemical Co.*, 511 F.Supp. 744 (M.D.Tenn.1981).

Stauffer raises important questions on appeal. It argues that the EPA has no authority to obtain ex parte search warrants which would deprive Stauffer of the opportunity to contest the validity of the warrant and a search and seizure in pursuance thereof. Stauffer also contends that the phrase "authorized representative" of the EPA Administrator, used in section 114(a)(2) of the Clean Air Act, means full time employees of the EPA, not employees of private contractors. Further, Stauffer maintains that the EPA is collaterally estopped from bringing this action, because

the parties have already litigated the question of who can act as an authorized representative of the EPA in a prior lawsuit in the federal courts in Wyoming, which decided the question in favor of Stauffer and against EPA. *Stauffer Chemical Co. v. EPA*, 14 E.R.C. 1729, *affirmed* 647 F.2d 1075 (10th Cir. 1981).

Because we agree with Stauffer that the present action is governed by collateral estoppel and res judicata, it is unnecessary to reach other issues, but we will treat all of the issues because they were briefed by both parties.

## I

The Clean Air Act, 42 U.S.C. §§ 7401 et seq., sets up a dual state-federal system of air pollution enforcement. Under the Act, the Administrator of the EPA is responsible for establishing national ambient air quality standards. 42 U.S.C. § 7409. The states are then primarily responsible for enforcing these standards, subject to supervision and approval by the EPA. *See* 42 U.S.C. §§ 7407, 7410, 7412. Pursuant to its mandate under the Clean Air Act, the EPA conducts an "Overview Inspection Program" in which it annually inspects approximately ten percent of the major stationary sources of air pollution in each state. Establishments which are selected for overview inspection have already been inspected by state air pollution authorities at some prior time, with the results of the state inspection being submitted to the EPA. The purpose of the overview inspections is to evaluate the state's performance in implementing the Clean Air Act by comparing the results of the overview inspection with the previously-reported results of the state's inspection.

---

1. Section 114(a)(2) of the Clean Air Act, 42 U.S.C. § 7414(a)(2), reads as follows:

 (2) the Administrator *or his authorized representative*, upon presentation of his credentials—

 (A) shall have a right of entry to, upon, or through any premises of such person or in which any records required to be maintained under paragraph (1) of this section are located, and

 (B) may at reasonable times have access to and copy any records, inspect any monitoring equipment or method required under paragraph (1), and sample any emissions which such person is required to sample under paragraph (1).

 (Emphasis added.)

The State of Tennessee is part of the Environmental Protection Agency's Region IV, which also includes North Carolina, South Carolina, Kentucky, Alabama, Florida, and Georgia.

On October 17, 1979, Mr. John W. Hund, an environmental scientist employed by the EPA's Enforcement Division in Region IV, conducted an unannounced overview inspection of Stauffer Chemical Company's elemental phosphorus furnace plant in Mt. Pleasant, Tennessee. He was accompanied by two employees of the Tennessee Division of Air Pollution Control. A significant source of air pollution, the number three nodulizing kiln, was not in operation that day. As a result, the amount of pollutants being emitted was not representative of normal operating conditions, so Mr. Hund decided that a follow-up inspection would be necessary.

The follow-up inspection was set for March 27, 1980. On that day, Hund returned to the Mt. Pleasant Plant, along with an employee of the Tennessee Division of Air Pollution Control. He was also accompanied this time by Ronald Hawks and Gary Saunders, who were employees of a private company under contract with the EPA, PEDCo Environmental, Inc. ("PED-Co"). Hawks and Saunders were brought along on this visit because they had recently conducted an EPA overview inspection at Stauffer's elemental phosphorus furnace plant in Tarpon Springs, Florida, and thus were familiar with the processes and equipment involved.

The group arrived at the plant and explained the purpose of their visit. They were informed by the plant manager that Stauffer had no objection to an inspection being conducted by the EPA and Tennessee state employees, but that it was contrary to

company policy to admit private individuals to company premises unless they first signed a suitable nondisclosure and hold harmless agreement.[2] The team then left the plant without conducting the inspection.

During the month of April, negotiations were carried on between Stauffer company headquarters in Connecticut, PEDCo, and the EPA in an attempt to arrive at a mutually agreeable nondisclosure agreement. PEDCo employees under contract with the EPA had previously been admitted to Stauffer's Silver Bow, Montana plant after signing a nondisclosure agreement. Therefore, PEDCo forwarded to Stauffer a copy of the agreement which had been used at the Montana plant, together with some suggested modifications requested by the EPA. Stauffer sent back a counter proposal, incorporating many of the provisions suggested by the EPA, but also adding some new ones. Certain of Stauffer's proposals, including one giving Stauffer exclusive control over what areas of the plant were to be inspected and another one requiring the EPA to give Stauffer two weeks advance notice of any inspection, were deemed unacceptable by PEDCo and the EPA. Consequently, they rejected this proposed agreement on May 5, 1980. Thereafter, the parties had no further contact until August.

On August 7, 1980, the EPA submitted an application and affidavits for a search warrant to inspect the Mt. Pleasant plant, which the magistrate granted ex parte. The warrant permitted

> duly authorized full-time employees [of EPA], and accompanying, authorized representatives under contract to EPA . . . to have entry upon [plant] premises during normal operating hours for the purpose of conducting an inspection, sampling, and monitoring pursuant to Section

2. The stated reason for this policy is to protect proprietary information as to trade secrets which outsiders might become privy to, and which might fall into the wrong hands and subject Stauffer to substantial damages for which it might have difficulty to recover complete reimbursement. For instance, Stauffer alleges that PEDCo also serves as a contractor for some of Stauffer's competitors.

The PEDCo employees in the instant case, Hawks and Saunders, had previously been admitted to Stauffer's plant in Tarpon Springs, Florida, by its plant manager, without being asked to sign any nondisclosure agreement. Stauffer maintains that this was unauthorized and was in violation of company policy and should not have been permitted.

114 of the Clean Air Act, 42 U.S.C. § 7414. . . .

There followed a long list of plant facilities and records which the inspectors were to have access to.

Armed with the warrant, an inspection team consisting of EPA's Hund, Ms. Carol Donohue of the Tennessee Division of Air Pollution Control, and Messrs. Hawks and Saunders of PEDCo went to Stauffer's Mt. Pleasant plant on August 7. They were also accompanied by the EPA attorney. Again there was an impasse. After conferring with company headquarters by telephone, plant officials informed the inspectors that the state and federal employees were free to conduct an inspection, but that the PEDCo employees would not be admitted without signing a nondisclosure agreement. Once again, the group left without conducting an inspection.

The next day, the EPA filed a petition in district court to hold Stauffer in contempt for its failure to honor the warrant. At the same time, Stauffer filed a motion to quash the warrant and for a temporary restraining order enjoining its enforcement. (The latter request was subsequently withdrawn by mutual agreement.) A consolidated hearing on both motions was held in the District Court for the Middle District of Tennessee on August 29, 1980. The court issued its decision on April 17, 1981, holding that the term "authorized representative" in section 114(a)(2) of the Clean Air Act "may include private contractors." 511 F.Supp. at 746. Accordingly, the court refused to quash the warrant. However, it also declined to hold Stauffer in contempt, finding that Stauffer legitimately believed that private contractors were not authorized representatives for purposes of clean air inspections. Execution of the warrant has been stayed pending this appeal.

## II

## COLLATERAL ESTOPPEL

■ A threshold issue in the present appeal is Stauffer's contention that consideration of this case is governed by the doctrine of collateral estoppel because the same parties have litigated the identical issues previously, resulting in a decision in favor of Stauffer's and against EPA by the federal district court in Wyoming and affirmed by the United States Court of Appeals for the Tenth Circuit.

As noted previously, the hearing in the federal district court in the present case was held on August 29, 1980. Shortly before that, on June 23, 1980, the federal district court in Wyoming issued an opinion holding that the phrase "authorized representative" in Section 114(a)(2) of the Clean Air Act, 42 U.S.C. § 7414(a)(2), does not include private contractors, particularly competitors with a conflict of interest or an axe to grind who may be interested in obtaining Stauffer's trade secrets. *In re Stauffer Chemical Company*, 14 E.R.C. 1737 (D.Wyo.1980), called "Stauffer I". (That decision was subsequently affirmed on appeal *sub nom. Stauffer Chemical Co. v. Environmental Protection Agency*, 647 F.2d 1075 (10th Cir. 1981)).

The facts in *Stauffer I* were identical to those in the instant case except they arose in a plant of Stauffer's at a different location. One morning in April 1980 a team of EPA inspectors arrived unannounced at Stauffer's Leefe Plant near Sage, Wyoming, in order to conduct a Clean Air Act oversight inspection. The team consisted of state and EPA employees, and two employees of a private contractor GCA Corporation. Stauffer was willing to admit the government employees but not the GCA personnel, unless they first signed a nondisclosure and hold harmless agreement. The EPA team did not agree to this condition and left without conducting the inspection. EPA then obtained an ex parte administrative search warrant from a U. S. Magistrate authorizing it to conduct an inspection of the Leefe Plant through the use of the two GCA employees. When the inspectors returned to the plant with the warrant, Stauffer still refused to admit the GCA employees unless they signed the agreement. This condition was again refused, and the team again departed without ac-

complishing its mission. Stauffer then filed an application for a temporary restraining order enjoining EPA and the two GCA employees from executing the warrant and a motion to quash the warrant, and the district court after an extensive hearing, permanently enjoined EPA from using GCA employees or employees of other companies under similar contract with EPA, in inspections of any Stauffer plant in Wyoming without the permission of Stauffer. Upon appeal by EPA the judgment of the district court was affirmed. *Stauffer I*, 647 F.2d at 1076–77 (10th Cir. 1981).

Stauffer therefore contends that, because the parties and the issues in *Stauffer I* and the present case were identical, and the issues were resolved against EPA in the prior litigation, the government acting through its agency, EPA is collaterally estopped from relitigating in this action the issue of who can be an "authorized representative" under Section 114 of the Act.

In *Montana v. United States*, 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979), Justice Marshall, who wrote the opinion for an almost unanimous court with only one dissenting opinion stated:

A fundamental precept of common-law adjudication, embodied in the related doctrines of collateral estoppel and res judicata, is that a "right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction ... cannot be disputed in a subsequent suit between the same parties or their privies ...." *Southern Pacific R. Co. v. United States*, 168 U.S. 1, 48–49 [18 S.Ct. 18, 27, 42 L.Ed. 355] (1897). Under res judicata, a final judgment on the merits bars further claims by parties or their privies based on the same cause of action. *Cromwell v. County of Sac*, 94 U.S. 351, 352 [24 L.Ed. 195] (1877); *Lawlor v. National Screen Service Corp.*, 349 U.S. 322, 326 [75 S.Ct. 865, 867, 99 L.Ed. 1122] (1955); 1B J. Moore, Federal Practice ¶ 0.405[1], pp. 621–624 (2d ed. 1974) (hereinafter 1B Moore); Restatement (Second) of Judgments § 47 (Tent. Draft No. 1, Mar. 28, 1973) (merger); *id.*, § 48 (bar).

Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1970); Scott, Collateral Estoppel by Judgment, 56 Harv.L.Rev. 1, 2–3 (1942); Restatement (Second) of Judgments § 68 (Tent. Draft No. 4, Apr. 15, 1977) (issue preclusion). Application of both doctrines is central to the purpose for which civil courts have been established, the conclusive resolution of disputes within their jurisdictions. *Southern Pacific R. Co., supra*, 168 U.S. at 49, 18 S.Ct. at 27; *Hart Steel Co. v. Railroad Supply Co.*, 244 U.S. 294, 299, 37 S.Ct. 506, 507, 61 L.Ed. 1148 (1917). To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.

As to res judicata, the Supreme Court, in an opinion delivered recently by Justice Rehnquist in *Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 101 S.Ct. 2424, 2427, 69 L.Ed.2d 103 (1981) stated:

There is little to be added to the doctrine of res judicata as developed in the case law of this Court. A final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. *Commissioner v. Sunnen*, 333 U.S. 591, 597 [68 S.Ct. 715, 719, 92 L.Ed. 898] (1948); *Cromwell v. County of Sac*, 94 U.S. 351, 352–353 [24 L.Ed. 195] (1877).

Since the parties as well as the issues of fact and law in the present case and *Stauffer I* were identical, there is no valid reason why they should be relitigated a second time in the present case. It brings up the question, how many times does the govern-

ment have to lose a case before either the doctrines of collateral estoppel or res judicata are applied? If we were dealing with private parties rather than the government, there would be no question about it. If EPA really believed that the decision of the Tenth Circuit in *Stauffer I* was wrong, it could have petitioned the Supreme Court for certiorari, but it did not avail itself of that remedy, and it is too late to do so now. EPA cannot collaterally attack the Tenth Circuit decision in the present case.

The court in *Montana* also addressed the exception of "unmixed questions of law" quoting on 440 U.S. page 162, 99 S.Ct. p. 978 from *United States v. Moser*, 266 U.S. 236, 242, 45 S.Ct. 66, 67, 69 L.Ed. 262 (1924) as follows:

"Where, for example, a court in deciding a case has enunciated a rule of law, the parties in a subsequent action *upon a different demand* are not estopped from insisting that the law is otherwise, merely because the parties are the same in both cases. But a *fact, question* or *right* distinctly adjudged in the original action cannot be disputed in a subsequent action, even though the determination was reached upon an erroneous view or by an erroneous application of the law." *Ibid.* (emphasis added). 440 U.S. p. 162, 99 S.Ct. p. 978.

It is noteworthy that "[a] fact, question, or right distinctly adjudged in the original action, cannot be disputed in a subsequent action, even though the determination was reached upon an erroneous view or by an erroneous application of the law." Since the fact, question or right in the present case was distinctly adjudged in *Stauffer I* the exception in *Moser* is inapplicable here.

We therefore hold that the Environmental Protection Agency is barred from relitigating these issues with Stauffer.

**3.** Throughout this opinion, "the Act" will be used to refer to the Clean Air Act, and "section 114" will refer to section 114 of the Clean Air Act, 42 U.S.C. § 7414.

## III

### A

The central issue in this case if not barred by collateral estoppel and res judicata is the meaning of the phrase "authorized representative" in section 114(a)(2) of the Clean Air Act,[3] 42 U.S.C. § 7414(a)(2). That section provides:

(a) the Administrator or his authorized representative, upon presentation of his credentials—

(A) shall have a right of entry to, upon, or through any premises of such person or in which any records required to be maintained under paragraph (1) of this section are located, and

(B) may at reasonable times have access to and copy any records, inspect any monitoring equipment or method required under paragraph (1), and sample any emissions which such person is required to sample under paragraph (1).

To date, few courts have been called upon to consider this question. In addition to the lower court in the instant case, the Ninth and Tenth Circuits have recently examined this issue, reaching opposite conclusions. *See Bunker Hill Company Lead and Zinc Smelter v. United States Environmental Protection Agency*, 658 F.2d 1280 (9th Cir. 1981); *Stauffer Chemical Company v. Environmental Protection Agency*, 647 F.2d 1075 (10th Cir. 1981). These cases are discussed, *infra.*[4]

### B

As noted earlier, the district court in the present case held that the phrase "authorized representative" in section 114(a)(2) of the Act may include private contractors. 511 F.Supp. at 746. The court founded its opinion on three main points: the plain meaning of the words used; a comparison with section 114(c) of the Act; and rejection of a statement in the legislative history

**4.** The issue was also raised recently in the Fourth Circuit, but the case was remanded without reaching the merits. *Aluminum Co. of America v. United States Environmental Protection Agency*, 663 F.2d 499 (4th Cir. 1981).

of the Clean Water Act which refers to the Clean Air Act.

The court discussed the plain meaning of the words "authorized representative," which were used in the Senate bill, as opposed to the phrase "officers or employees," which was used in the House bill, and reasoned that the adoption of the Senate version evidenced a deliberate choice to give the EPA broader authority in making inspections because the plain meaning of "representative" is broader than "officers or employees." 511 F.Supp. at 747. The court applied similar reasoning to the difference between section 114(c) and the motor vehicle inspection provisions of the Act, found in sections 206(c) and 208(a), 42 U.S.C. §§ 7525(c) and 7542(a). Since the latter sections use the phrase "officer or employee," the court concluded that Congress must have made a deliberate choice to use a broader term in section 114(a). *Id.* at 746.

The district court also placed great weight on the use of the phrase "officers, employees, or authorized representatives" in section 114(c) of the Act, 42 U.S.C. § 7414(c). That section allows the Administrator to disclose confidential information obtained in the course of section 114(a) inspections to "other officers, employees, or authorized representatives of the United States" who have a legitimate need for it. As used in section 114(c), "authorized representatives" clearly means someone other than employees, because otherwise it would be redundant. Therefore, reasoned the court, "authorized representative" must mean someone other than employees in section 114(a) as well. *Id.*

The third foundation of the district court's holding was its decision to reject as non-authoritative a statement in the legislative history of the Clean Water Act, which was enacted after the Clean Air Act, to the effect that the Clean Air Act does not permit contractors to be used as "authorized representatives." (This passage will be discussed further, *infra.*) The court admitted that this statement was troubling, but concluded that post-enactment statements of legislative intent are an unreliable guide and should not be followed. *Id.* at 747.

In *Bunker Hill Co. Lead and Zinc Smelter v. United States Environmental Protection Agency,* 658 F.2d 1280 (9th Cir. 1981), the Ninth Circuit reached the same result as the district court in the case at bar. The *Bunker Hill* court reasoned that the plain meaning of "authorized representative" is broader than "officers or employees," 658 F.2d at 1283, and that the Clean Water Act legislative history was entitled to no weight because it came after the enactment of the Clean Air Act. *Id.* at 1284. The court also found that Congress had tacitly ratified EPA's use of private contractors by approving appropriations for their use. *Id.*

The Tenth Circuit arrived at the opposite conclusion. In *Stauffer Chemical Co. v. Environmental Protection Agency,* 647 F.2d 1075 (10th Cir. 1981), which we have been referring to as *Stauffer I,* the court held that a private contractor cannot be an "authorized representative" of the Administrator under section 114(a)(2). The Tenth Circuit rejected the plain meaning approach, and relied instead upon the legislative history of section 114(a), which speaks of the Department of Health, Education and Welfare (DHEW) (now EPA), "personnel," and noted that employees of a contractor are not EPA personnel, but the contractor's personnel. 647 F.2d at 1078. The court also found the Clean Water Act legislative history persuasive. While noting that post-enactment statements should generally be accorded less weight than contemporaneous legislative history, the court concluded that the Clean Water Act legislative history should be considered because of the close subject matter relationship between the two acts and the short time span between them. *Id.* at 1079. In addition, a holding that private contractors could be authorized representatives under Section 114(a) would create an unacceptable anomaly between the Clean Air and Clean Water Acts, i.e., EPA could use private contractors to conduct inspections under the Clean Air Act, but not under the Clean Water Act, even though the wording of the two statutes is virtually identical. *Id.*

## IV

With these conflicting precedents in mind, we begin our analysis. At the outset, let us frankly admit that although consistency is a virtue in statutory interpretation, various portions of the Clean Air Act are not consistent with each other, making it impossible to arrive at an entirely satisfying result. *See Citizens to Save Spencer County v. United States Environmental Protection Agency*, 600 F.2d 844, 870 (D.C. Cir.1979). The statute itself does not define "representative." *See* 42 U.S.C. § 7602. As the court below noted, both parties in this case have submitted excellent briefs. Indeed, this case is an apt illustration of Chief Justice Marshall's comment that "[w]here the mind labors to discover the design of the legislature, it seizes everything from which aid can be derived...." *United States v. Fisher*, 6 U.S. (2 Cranch) 358, 386, 2 L.Ed. 304 (1805). The lower court was also correct, though, in saying that there is little that could make the resolution of this problem easier. On balance, however, we believe the Tenth Circuit's position is the correct one.

 The district court and the Ninth Circuit relied upon the plain meaning of the word "representative." However, the plain meaning of statutory language is not always decisive. *Lynch v. Overholser*, 369 U.S. 705, 710, 82 S.Ct. 1063, 1067, 8 L.Ed.2d 211 (1962); *Missouri Pacific Railroad Co. v. Austin*, 292 F.2d 415 (5th Cir. 1961). This is especially true when the legislative history suggests a different interpretation. *Cleary v. Chalk*, 488 F.2d 1315 (D.C.Cir.1973). The legislative history of an act must be examined in order to ascertain Congressional intent, even though the statutory language appears to be plain. *United States v. Kelly*, 328 F.2d 227 (6th Cir. 1964); *United States v. Hepp*, 497 F.Supp. 348 (N.D.Iowa 1980); *see Lewis v. United States*, 445 U.S. 55, 100 S.Ct. 915, 63 L.Ed.2d 198 (1980).

The Clean Air Act as originally enacted in 1955 was extensively revised and enlarged by the Clean Air Act Amendments of 1970, P.L. 91–604. The final version of the Clean Air Act which emerged was an amalgam of the House and Senate bills, title I, relating to stationary air pollution sources, being derived from the Senate bill and title II, pertaining to motor vehicles, coming from the House bill. The house bill, H.R. 17255, consistently used the phrase "officers or employees" throughout. Thus section 112(f) of H.R. 17255 provided:

> For purposes of enforcement of this section, *officers or employees* duly designated by the Secretary, upon presenting appropriate credentials and a written notice to the owner or person in charge, are authorized to enter, at reasonable times, any establishment which the Secretary has reason to believe is or may be in violation of regulations issued under this section to determine whether any such violation is occurring....

H.R. 17255, 91st Cong., 2d Sess. § 112(f) (1970), *reprinted in A Legislative History of the Clean Air Amendments of 1970* (hereafter cited as "*Air Leg. Hist.*") at 923 (1974) (emphasis added).

The Senate bill, on the other hand, used the phrase "authorized representative." Section 116(a)(3) of S. 4358 provided in part:

> For the purpose of ... making any investigation under this Act of any building, structure, monitoring equipment, or other facility subject to any air quality standard ... the Secretary or his *authorized representative* shall have a right of entry to, upon or through such building, structure, or facility, upon presentation of his credentials.

S. 4358, 91st Cong., 2d Sess. § 116(a)(3) (1970), *reprinted in Air Leg. Hist.* at 570 (emphasis added).

The respective legislative histories of these two bills did not discuss the meaning of the phrases used, but merely repeated without discussion the terminology used in the bills. *Compare* H.R.Rep.No.91–1146, 91st Cong., 2d Sess. (1970), *reprinted in Air Leg. Hist.* at 901, *with* S.Rep.No.91–1196, 91st Cong., 2d Sess. 58 (1970), *reprinted in Air Leg. Hist.* at 459. The conference report stated that the House bill "authorized entry into and inspection of suspected pollu-

ters' facilities by DHEW investigative personnel," while "the Senate authorized entry and inspection by DHEW personnel."[5] Conf.Rep.No.91–1783, 91st Cong., 2d Sess. (1970), reprinted in Air Leg. Hist. at 197 and [1970] U.S.Code Cong. & Ad.News, 5356, 5374, 5379–80. The final version which was enacted and became section 114(a) followed the language of the Senate bill. Id., reprinted in Air Leg. Hist. at 198 and [1970] U.S.Code Cong. & Ad.News at 5374, 5381.

■ Although the district court attributed great importance to the difference between the House's "officers or employees" and the Senate's "authorized representative," Congress itself did not. As we have seen, the conference report on the Clean Air Amendments states that the House bill authorized entry and inspection by "DHEW investigative personnel" and the Senate bill authorized entry and inspection by "DHEW personnel." It is therefore apparent that Congress considered the two phrases to be equivalent. Although it is ordinarily presumed that a difference in language reflects a difference in meaning, when the legislative history shows that no difference was in fact intended, that presumption is rebutted. Moore v. Harris, 623 F.2d 908 (4th Cir. 1980). As the Tenth Circuit noted, employees of private contractors are not the EPA's personnel, they are the contractor's personnel. Stauffer I, 647 F.2d at 1078. Moreover, the language of rejected alternative legislation is not entitled to great weight in construing legislation that was finally passed, since the court has no way of knowing what motivated the legislature to take such action. 73 Am.Jur.2d Statutes § 171 (1974); see Holt v. Middlebrook, 214 F.2d 187 (4th Cir. 1954).

■ A statute should be read and construed as a whole and, if possible, given a harmonious, comprehensive meaning. Weinberger v. Hynson, Wescott & Dunning,

Inc., 412 U.S. 609, 631–32, 93 S.Ct. 2469, 2484, 37 L.Ed.2d 207 (1973); Federal Trade Commission v. Manager, Retail Credit Co., Miami Branch Office, 515 F.2d 988 (D.C.Cir. 1975); Ashcroft v. United States Department of Interior, 513 F.Supp. 595 (D.Ariz. 1981). Construing authorized representatives under section 114(a)(2) to include private contractors would lead to inconsistencies between that section and other parts of the Clean Air Act. Section 114(d), added by the Clean Air Amendments of 1977, P.L. 95–95, requires "the Administrator (or his representatives)" to give notice to the applicable state pollution control agency before making an inspection under section 114(a)(2). The purpose of this notice is to foster cooperation and consultation between the EPA and the states regarding enforcement matters. H.R.Conf.Rep.No.95–564, 95th Cong., 1st Sess. 136 (1977), reprinted in [1977] U.S.Code Cong. & Ad.News 1077, 1502, 1516. Stauffer argues—correctly, we think—that Congress could not have intended to entrust this kind of sensitive intergovernmental communication to employees of private contractors. Rather, the word "representatives" as used in section 114(d) necessarily envisions EPA employees. In interpreting the meaning of one provision of an act it is proper that all other provisions in pari materia also be considered. Saxon v. Georgia Association of Independent Insurance Agents, Inc., 399 F.2d 1010 (5th Cir. 1968). Since sections 114(a) and (d) both concern inspections, we conclude that the term "representative" should be given the same meaning in both sections.

The trial court focused instead on section 114(c), 42 U.S.C. § 7414(c), which concerns disclosure of information. That section allows the Administrator to disclose confidential information obtained during section 114(a) inspections to "other officers, employees, or authorized representatives of the United States" who may need it to carry out their duties. The court reasoned, logi-

---

5. At the time the Clean Air Act was being considered, air pollution enforcement was the responsibility of the Department of Health, Education and Welfare (DHEW). Those duties were transferred to the Environmental Protec-

tion Agency when it was created. Consequently, "DHEW personnel" should now be read to mean "EPA personnel." See Conf.Rep.No.91–1783, 91st Cong., 2d Sess. (1970), reprinted in [1970] U.S.Code Cong. & Ad.News 5374, 5374.

cally enough, that in the context of section 114(c), "authorized representatives" obviously means someone other than officers or employees because otherwise it would be redundant. 511 F.Supp. at 746. We agree that that is the only reasonable conclusion with regard to section 114(c), but we disagree that the use of "representatives" in that section controls the use of that word in section 114(a).

We believe that the interpretation of the word "representative" in these various sections is simply a matter of grammar. "Representative" in section 114(c) must mean someone other than officers or employees because they have already been mentioned. However, officers and employees are not mentioned in sections 114(a) and (d). To apply the same meaning to "representative" in those sections would lead to the absurd result that only the Administrator and employees of private contractors could make pollution inspections, and EPA employees could not.

■ Therefore, the only logical conclusion is that the word "representative" as used in section 114 of the Clean Air Act means EPA officers or employees, unless the latter are already enumerated, as they are in section 114(c). In that event, the plain meaning of "representative," i.e., one standing or acting for another through delegated authority, controls. We realize that this leads to the undesirable result that the word "representative" has different meanings in different portions of the statute, but we suggest that this is one of the instances in which one is simply forced to conclude that there is a lack of congruence between one section of the statute and another. The same phrase used in different sections of a complex act does not necessarily carry the same meaning in each context. *In re Petition of Chin Thloot Har Wong*, 224 F.Supp. 155 (S.D.N.Y.1963).

This construction of the phrase "authorized representative" in section 114(a)(2) is buttressed by section 301(a) of the Act, 42

U.S.C. § 7601(a). That section provides in part that the Administrator "may delegate to any *officer or employee* of the Environmental Protection Agency such of his powers and duties under this Act, except the making of regulations, as he may deem necessary or expedient." (Emphasis added.) The EPA argues that the word "Administrator" in section 114(a)(2) should be construed to mean "officer or employee" on the assumption that the Administrator has already exercised his delegation authority under section 301(a), and therefore "authorized representative" means someone other than officers or employees. While this interpretation is ingenious, we think that a more natural reading is that "authorized representative" contemplates the delegation authorized by section 301(a) which, of course, is limited to officers or employees. Moreover, the word "Administrator" is defined in section 302(a), 42 U.S.C. § 7602(a), as "the Administrator of the Environmental Protection Agency." The statutory definition of that word is therefore limited to the named official, and does not include officers or employees.

■ Our task is complicated by the fact that the Clean Air Act has comparable, but separate, provisions for inspection of motor vehicle engines at the manufacturers' plants, and these provisions are worded differently. Section 206(c) of the Act, 42 U.S.C. § 7525(c), permits "officers or employees duly designated by the Administrator" to enter the plants of motor vehicle manufacturers for the purpose of testing motor vehicles or engines. Section 208(a), 42 U.S.C. § 7542(a), requires motor vehicle manufacturers to maintain records and provides in part:

> Every manufacturer ... shall, upon request of an officer or employee duly designated by the Administrator, permit such officer or employee at reasonable times, to have access to and copy such records.[6]

---

6. Section 208(b), 42 U.S.C. § 7542(b), is comparable to section 114(c), 42 U.S.C. § 7414(c), regarding confidentiality of records, and permits the Administrator to disclose confidential information to "other officers, employees, or authorized representatives of the United

At the time the 1970 Clean Air Amendments were enacted, there was an existing section 207(a) of the Act, former 42 U.S.C. § 1857f–6, comparable to the present section 208(a), 42 U.S.C. § 7542(a), which used the phrase "officer or employee." The 1970 House bill, H.R. 17255, from which the present title II of the Act was derived, retained the language of the former statute in using the words "officer or employee."

As we have seen, Congress chose the Senate version using "authorized representative" in enacting section 114. The EPA argues, and the district court agreed, that the choice of "authorized representative" in section 114(a) as opposed to "officer or employee" in former section 207(a) shows a deliberate decision on the part of Congress to give the EPA broader inspection authority with regard to stationary sources (section 114) than for motor vehicles (sections 206 and 208). However, it is just as logical— and, we think, preferable—to hold that these sections should be construed so that they harmonize with each other, i.e., so that the inspection and entry power for both stationary sources and motor vehicles is limited to EPA officers and employees.

 Different portions of the same statute should be read and interpreted consistently with each other, avoiding conflicts. *Citizens to Save Spencer County v. United States Environmental Protection Agency, supra,* 600 F.2d at 870; *United States v. Toledo, Peoria & Western Railroad Co.,* 280 F.Supp. 243 (N.D.Ind.1968); *American Cyanamid Co. v. Ladd,* 225 F.Supp. 709 (D.D.C.1964). In determining the meaning of a statute, a court must consider the consequences that would result from construing it one way or the other. *Sheftic v. Boles,* 295 F.Supp. 1347 (N.D.W.Va.1969). It would be illogical and inconsistent to hold that the EPA may use private contractors to conduct inspections under the stationary source portion of the Clean Air Act but not under the motor vehicle portion of the same Act.

 Moreover, the legislative history does not reflect any conscious choice on the part of Congress to give the EPA broader authority under section 114 than it has under section 206. The conference report discusses each section of the final bill, but does not mention the difference in phraseology between section 114 and sections 206 and 208. *Compare* the discussion of section 114 in Conf.Rep.No.91–1783, 91st Cong., 2d Sess. (1970), *reprinted in* [1970] *U.S.Code Cong. & Ad.News* 5374, 5379–81 *with* the discussion of section 206, *id.* at 5382–84.[7] Ordinarily, the use of different language creates an inference that Congress meant different things. However, when the statutory purposes and legislative history establish that no difference was in fact intended, the inference is negated. *Moore v. Harris, supra.* Since section 114 was taken from the Senate bill and sections 206 and 208 from the House bill, rather than showing a conscious choice on the part of Congress, it seems more likely that the final product was a result of the two bills being tacked together without any thought being given to this small difference in their wording. Allowance must sometimes be made for human error and inadvertence in drafting legislation. *Citizens to Save Spencer County v. United States Environmental Protection Agency, supra,* 600 F.2d at 871–72.

States" when necessary for any proceeding under the Act. The purpose of these provisions is to protect government personnel from liability under the Trade Secrets Act, 18 U.S.C. § 1905, which they would otherwise incur by disclosing such information.

7. The conference report states: "The provisions of the House bill and the Senate amendment revising the procedures under existing law for prototype testing and authorizing production line testing of new motor vehicles and engines were essentially the same . . . ." Conf. Rep.No.91–1783, 91st Cong., 2d Sess. (1970),

reprinted in Air Leg. Hist. at 201 and [1970] U.S.Code Cong. & Ad.News 5374, 5382. Stauffer argues that this demonstrates, as in the case of section 114, that Congress equated "authorized representatives" with "officers or employees." The EPA contends that the above statement refers only to the provisions for prototype and production line testing, not entry. We believe it is unclear whether this statement was meant to include the entry provisions of the two bills or only the testing procedures, and we therefore give it no weight one way or the other.

Another factor which strongly militates in favor of the interpretation which we adopt here is Congress's amendment of the Federal Water Pollution Control Act ("Clean Water Act") in 1972. Section 308(a) of the Clean Water Act, 33 U.S.C. § 1318(a)(B), is copied virtually word-for-word from section 114(a)(2) of the Clean Air Act.[8] The Senate report on S. 2770, which was the basis of the final enactment, says the following about section 308:

> It should also be noted that the authority to enter, as under the Clean Air Act, is reserved to the Administrator and his authorized representatives *which such representatives must be full time employees of the Environmental Protection Agency.* The authority to enter is not extended to contractors with the EPA in pursuit of research and development.

S.Rep.No.92–414, 92d Cong., 2d Sess. (1971), *reprinted in* [1972] *U.S.Code Cong. & Ad. News* 3668, 3729 (emphasis added).

The district court, 511 F.Supp. at 747, and the Ninth Circuit, *Bunker Hill,* 658 F.2d at 1284, dismissed this statement because it was made after enactment of the Clean Air Act. We, on the other hand, believe it is critical.

We realize that ordinarily, "[a] mere statement in a conference report . . . as to what the Committee believes an earlier statute meant" is entitled to little weight. *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 118 n. 13, 100 S.Ct. 2051, 2061 n. 13, 64

L.Ed.2d 766 (1980). However, this is an exceptional case. The understanding of a later Congress, while not binding, is entitled to deference. *Moore v. Harris, supra.* Where a problem of interpretation was apparently not foreseen by Congress, it is appropriate to consult and be guided by those areas covering the same subject where the expression of legislative intent is clear. *DeAvilia v. Civiletti,* 643 F.2d 471 (7th Cir. 1981). The Clean Air and Clean Water Acts are in *pari materia* with one another. *General Motors Acceptance Corp. v. Whisnant,* 387 F.2d 774 (5th Cir. 1968); *Hallenbeck v. Penn Mutual Life Insurance Co.,* 323 F.2d 566 (4th Cir. 1963); *see Atlantic Refining Co. v. Federal Trade Commission,* 344 F.2d 599 (6th Cir. 1965). This is especially true when the Clean Water Act's section 308(a) was explicitly modeled after section 114(a)(2) of the Clean Air Act. *Oscar Mayer & Co. v. Evans,* 441 U.S. 750, 755–56, 99 S.Ct. 2066, 2071, 60 L.Ed.2d 609 (1979); *United States v. Freeling,* 31 F.R.D. 540 (S.D.N.Y.1962).

Moreover, the Senate report on the Clean Water Amendments was authored a scant ten months after passage of the Clean Air Act, by the same committee (Public Works) which considered the Clean Air Act. Thus, in the circumstances of this case, it is proper to give the quoted statement great weight, even though a similar statement was years later might be of little value.[9]

---

**8.** Section 308(a)(B) of the Clean Water Act, 33 U.S.C. § 1318(a)(B), reads as follows:

> (B) the Administrator or his authorized representative, upon presentation of his credentials—
> (i) shall have a right of entry to, upon, or through any premises in which an effluent source is located or in which any records required to be maintained under clause (A) of this subsection are located, and
> (ii) may at reasonable times have access to and copy any records, inspect any monitoring equipment or method required under clause (A), and sample any effluents which the owner or operator of such source is required to sample under such clause.

As stated in the Senate Report about Section 308, the authority to enter is not extended to

contractors with the EPA in pursuit of research and development.

**9.** The district court pointed to the last sentence in the quoted statement regarding contractors and found that, since section 103(b)(4) of the Clean Air Act, 42 U.S.C. § 7403(b)(4), permits the use of contractors for research and development, there was a "lack of congruence" between the Clean Air and Clean Water Acts, making the relevance of the Clean Water Act legislative history questionable. 511 F.Supp. at 747. This overlooks the fact that section 104(b)(4) of the Clean Water Act, 33 U.S.C. § 1254(b)(4), also permits the EPA to contract with private organizations for research and development.

It should also be noted that section 308(b) of the Clean Water Act, 33 U.S.C. § 1318(b), tracks the language of section 114(c) of the Clean Air Act in permitting the Administrator to reveal confidential information to "other officers, employees, or authorized representatives of the United States." [10] Since it is manifest that the word "representative" was given two different meanings in section 308 of the Clean Water Act, this reinforces our interpretation, *supra*, giving that word two meanings in section 114 of the Clean Air Act.

As we have seen, section 114 of the Clean Air Act and section 308 of the Clean Water Act are in *pari materia*, and should be interpreted the same way. We have also seen that courts must consider the consequences which would result from a particular construction. *Sheftic v. Boles, supra.* As the Tenth Circuit recognized in *Stauffer I*, 647 F.2d at 1079, if the EPA's interpretation of section 114, permitting private contractors to be "authorized representatives" is followed, it would lead to the anomalous result that the EPA could use private contractors to make inspections under the Clean Air Act, but not to make inspections under the Clean Water Act, even though the wording of the statutes is identical. Such a result makes no sense, and we decline to introduce such a blatant contradiction into the law.

It is instructive to compare the statutes which we have been discussing with the Solid Waste Disposal Act Amendments of 1980, P.L. 96–482. Section 3007 of the Solid Waste Disposal Act, 42 U.S.C. § 6927, formerly permitted entry and inspection of facilities which generate or handle hazardous wastes by "any officer or employee of the Environmental Protection Agency, duly designated by the Administrator, or . . . any duly designated officer [or] employee of a State having an authorized hazardous waste program. . . ." The 1980 amendments inserted "representative" after "employee," so that inspection authority is now given to "any officer, employee or representative" of EPA or the states. The legislative history of the 1980 Solid Waste Dis-

posal Act Amendments expressly shows that the word "representative" was added for the specific purpose of covering private contractors: "the amendment clarifies that the Administrator may authorize EPA contractors to obtain samples, perform inspections, and examine records at facilities which handle hazardous wastes." S.Rep. No.96–172, 96th Cong., 2d Sess. 3 (1979), *reprinted in* [1980] *U.S.Code Cong. & Ad. News* 5019, 5021.

> The Senate bill includes amendments to section 3007(a) to assure that the inspection authority for purposes of developing regulations or enforcement provisions extends to . . . employees and representatives of the Environmental Protection Agency.

H.R.Conf.Rep.No.96–1444, 96th Cong., 2d Sess. 35 (1980), *reprinted in id.*, 5028, 5034.

The Ninth Circuit compared "authorized representative" in section 114 of the Clean Air Act with "officers or employees" in section 206 of the Act and concluded that, "where Congress meant to limit inspections to officers and employees it did so." *Bunker Hill*, 658 F.2d at 1283. The district court below reached the same conclusion. 511 F.Supp. at 746. Without faulting the logic of that position, we think the shoe can just as logically go on the other foot: section 6927 shows that, when Congress meant to *expand* inspection authority *beyond* EPA officers and employees it knew how to do so and took specific steps to make that clear.

We have criticized the district court's and Ninth Circuit's position, construing "representative" to include contractors, for leading to an inconsistency between the Clean Air and Clean Water Acts. Our position restricting "representative" to officers and employees of the EPA leads to an inconsistency between the Clean Air and Clean Water Acts on one hand the Solid Waste Disposal Act on the other, i.e., under our view the EPA will be able to use private contractors to conduct inspections under the Solid Waste Disposal Act but not under the Clean Air and Clean Water Acts. This

10. *See* footnote 6, *supra*.

inconsistency is also regrettable, but it at least has the virtue of being founded upon express differences in language and explicit statements of Congressional intent, instead of treating identically-worded statutes differently.

EPA argues that Congress has ratified its use of contractors by its failure to amend section 114(a) in 1977 when it enacted that year's Clean Air Amendments (which added section 114(d)), and by approving EPA budget requests which included amounts budgeted for use of contractors in Clean Air enforcement activities. Stauffer counters that there has been no Congressional ratification, only inaction or silence. We agree with the district court that the evidence either way on ratification is inconclusive.

Section 114(d) was added by the Clean Air Amendments of 1977, P.L. 95–95. EPA argues that, while Congress was thus amending section 114, it could have amended section 114(a)(2) if it was dissatisfied with the "authorized representative" language, but did not do so. We agree with the district court's conclusion, 511 F.Supp. at 749, that it does not appear that Congress considered the question of who is an authorized representative at that time. Neither the legislative history of the House bill, which was enacted, nor the conference report discusses the question of authorized representative. *See* H.R.Rep.No.95–294, 95th Cong., 1st Sess. 27 (1977), *reprinted in* [1977] *U.S.Code Cong. & Ad.News* 1077, 1105 and H.R.Conf.Rep.No.95–564, 95th Cong., 1st Sess. 135 (1977), *reprinted in id.*, 1502, 1516. "Legislative silence is a poor beacon to follow in discerning the proper statutory route." *Zuber v. Allen*, 396 U.S. 168, 185, 90 S.Ct. 314, 323, 24 L.Ed.2d 343 (1969). However, as we have discussed above, section 114(d) uses the word "representative" in a sense which can only be synonymous with "officer or employee."

The EPA also argues that Congress has ratified its use of contractors as "authorized representatives" by its approval of agency appropriations requests which included amounts for use of contractors in Clean Air enforcement activities. For instance, EPA quotes a 1977 budget request to "obtain contractor assistance to solve non-attainment problems posed by Class A and Class B emitters."

The Supreme Court has noted that Congressional ratifications may be effected through appropriations acts. However, "the appropriation must plainly show a purpose to bestow the precise authority which is claimed." *Ex Parte Endo*, 323 U.S. 283, 303 n. 24, 65 S.Ct. 208, 219 n. 24, 89 L.Ed. 243 (1944). In our opinion, it is doubtful that an obscure budget item couched in the kind of murky language quoted above is sufficient to plainly show a Congressional intent to ratify the EPA's interpretation of "authorized representative," especially in the fact of an explicit expression of intent to the contrary in the legislative history of the Clean Water Act, discussed *supra*. Also, the appropriation could be construed to provide for the payment of contractors only where the statute expressly authorized their use such as for research and development and other specific purposes.

By differing with the district court, we do not denigrate the court's able opinion, for cogent arguments can be raised on both sides. The EPA filed affidavits in the court below stating that forbidding it to use contractors in Clean Air oversight inspections would hamper or even cripple the program, and it might also be argued that, in this era of government cutbacks, it is preferable to permit the EPA to use contractors rather than hire more full time employees. On the other hand, the execution of search warrants is a traditionally governmental function, and Stauffer and other owners of commercial property have legitimate concerns regarding the safety of trade secrets when employees of contractors, who may have other clients and conflicting interests, are permitted to conduct inspections under ex parte search warrants issued where the property owner is afforded no opportunity to be heard.

For the reasons outlined above, we hold that the words "authorized representative" in section 114(a)(2) of the Clean Air

Act, 42 U.S.C. § 7414(a)(2), mean officers or employees of the EPA, and cannot include employees of private contractors, and that the district court erred in its holding to the contrary and in failing to quash the search warrant which improperly permitted access to Stauffer's facilities by employees of PEDCo acting as representatives of the EPA.

The judgment of the district court is reversed and the cause is remanded with instructions to enter judgment in favor of Stauffer.

NATHANIEL R. JONES, Circuit Judge, concurring.

Although I concur with Judge Weick's well-reasoned opinion, I write separately to articulate my views concerning the application of collateral estoppel to the present case.[1] In my opinion, the application of the doctrine precludes this Court from addressing the merits of the issue presented. Accordingly, I limit my concurrence to section II of Judge Weick's opinion.

Application of the doctrine of collateral estoppel involves a consideration of three factors. Under this doctrine, a judgment rendered in a prior law suit between the parties precludes the relitigation of those issues previously raised, considered and determined when a subsequent suit, based upon a different claim or demand, is brought. *Commissioner v. Sunnen*, 333 U.S. 591, 597–98, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948). Thus, a court must initially determine whether the issues presented in the second action are identical to those resolved in the previous action. *Montana v. United States*, 440 U.S. 147, 155, 99 S.Ct. 970, 974, 59 L.Ed.2d 210 (1979). In the instant case, it is undisputed that the issue resolved by the litigation in *Stauffer I* is identical to the question raised in this appeal.

However, the finding of an identity of issues in the first and second action does not end the inquiry. This Court has steadfastly refused to apply the doctrine of col-

lateral estoppel mechanically or rigidly. Rather, this rule is "qualified or rejected when [its] application would contravene an overriding public policy or result in manifest injustice." *Tipler v. E. I. duPont deNemours & Co.*, 443 F.2d 125, 128 (6th Cir. 1971). *See also Shimman v. Frank*, 625 F.2d 80, 89 (6th Cir. 1980); *United States v. LaFatch*, 565 F.2d 81, 83 (6th Cir. 1977), *cert. denied sub nom., LaFatch v. MM Corp.*, 435 U.S. 971, 98 S.Ct. 1611, 56 L.Ed.2d 62 (1978); *Bronson v. Board of Education*, 525 F.2d 344, 349 (6th Cir. 1975), *cert. denied*, 425 U.S. 934, 96 S.Ct. 1665, 48 L.Ed.2d 175 (1976). The Supreme Court, in *Montana v. United States, supra*, identified the following two questions, both of which must be resolved favorably to the party asserting collateral estoppel before the doctrine can be applied: (1) "whether controlling facts or legal principles have changed significantly" since the judgment in the prior suit; and (2) "whether other special circumstances warrant an exception to the normal rules of preclusion." 440 U.S. at 155, 99 S.Ct. at 974.

The first inquiry seeks to prevent the application of collateral estoppel in situations where the legal principles underlying the initial judgment have been altered, thus weakening its conclusive nature. *See Commissioner v. Sunnen*, 333 U.S. at 599–602, 68 S.Ct. at 720–721. An examination of the record in the present case reveals that there has been no such change in the legal principles underlying the decision in *Stauffer I*. Therefore, the only remaining issue is whether an exception to the application of the doctrine should be made on equitable grounds.

In *Montana v. United States*, the Supreme Court identified one set of circumstances which counsels against the application of the doctrine. "Redetermination of issues is warranted if there is reason to doubt the quality, extensiveness or fairness of the procedures in prior litigation." 440 U.S. at 164 n.11, 99 S.Ct. at 979 n.11. More-

1. As noted by Judge Siler in his concurring opinion, res judicata is inapposite to the present case since this litigation involves a different set of operative facts and hence a different cause of action than *Stauffer I*.

over, this Court has identified a number of other circumstances which have been found to justify an exception to the application of the rule. *See, e.g., Hawkins v. Holiday Inns, Inc.,* 652 F.2d 57 (6th Cir. 1981) (a broader range of proofs is required in the second action than in the prior action); *Shimman v. Frank, supra,* (lesser burden of proof required in the subsequent action than imposed in the first); *United States v. LaFatch, supra* (overriding public policy against bribery of public officials); *Tipler v. E. I. duPont deNemours & Co., supra* (differences in the purposes and requirements of the statutory provisions under which the prior and subsequent actions have been prosecuted). *See generally Westwood Chemical Co. v. Kulick,* 656 F.2d 1224, 1228–32 (6th Cir. 1981). EPA has not asserted, nor does the record reflect, that any of the circumstances identified by the preceding cases are present.

However, I note that, in his concurring opinion, Judge Siler identifies two apparent sources of injustice which would spring from the invocation of the rule. Initially, he states that "injustice would result if EPA were precluded from entering in Stauffer's plant in Tennessee, but were using private contractors in entering competitors' plant in the same area." I am not persuaded. In my opinion, the injustice, if any, is suffered by Stauffer whose plants and trade secrets in one area will be protected, while in another, private individuals will be able to enter and inspect its facilities. To prevent such an anomaly, collateral estoppel should be applied. *See Continental Can Co. v. Marshall,* 603 F.2d 590 (7th Cir. 1979).[2] Further, given the concurrence of two panel members as to the issue of employing private contractors in these inspections, the injustice identified will remain since the EPA will *technically* retain

the power to use private contractors elsewhere in the circuit. But even EPA's power to use these individuals in its inspections is illusory since the *stare decisis* impact of the Court's holding today, if it becomes final, may be expected to eliminate the practice in this jurisdiction. *See Allegheny General Hospital v. NLRB,* 608 F.2d 965, 970 (3d Cir. 1979). In short, application of collateral estoppel is only minimally related to the harm identified.

Judge Siler also remarks that application of collateral estoppel is improper where several cases, involving the same legal issue, are being litigated in different areas and result in inconsistent decisions. However, I adhere to the position articulated in *Western Oil and Gas v. E. P. A.,* 633 F.2d 803, 809 (9th Cir. 1980), where the court concluded, "we think the fact of inconsistent decisions is a relevant, but not always dispositive, factor to be considered in the exercise of discretion [in refusing to apply the doctrine]." In the present case, this factor weighs in favor of applying the doctrine. The Ninth Circuit in articulating this rule relied on dictum appearing in several Supreme Court cases which apparently approve the practice of agency relitigation. *See E. I. duPont deNemours & Co. v. Train,* 430 U.S. 112, 135 n.26, 97 S.Ct. 965, 978 n.26, 51 L.Ed.2d 204 (1977); *Union Electric Co. v. E. P. A.,* 427 U.S. 246, 254–55, 96 S.Ct. 2518, 2523–24, 49 L.Ed.2d 474 (1976); *Train v. Natural Resources Defense Council, Inc.,* 421 U.S. 60, 72–75, 95 S.Ct. 1470, 1478–79, 43 L.Ed.2d 731 (1975). However, an examination of these cases reveals that they involved circumstances not present here. In each, the agency's relitigation of an issue in several courts of appeal was prosecuted by and against *different* parties as opposed to the *same* party as in the case at bar. Although not dispositive, this factor weighs on

---

**2.** *Continental Can* involved a somewhat analogous situation. There, a can manufacturer sued to enjoin the Department of Labor from prosecuting pending citations issued as a result of alleged violations of OSHA noise regulations. Previously, a proceeding involving several of the manufacturer's plants in California resulted in a finding that the company had fulfilled its obligation by employing the most

economically feasible engineering controls. After noting that the manufacturer's other eighty plants, located nationwide, were structurally similar and had the identical noise "problem" as that involved in the prior proceeding, the court held that fairness required an application of collateral estoppel in order to dismiss the pending citations concerning these other plants.

the side of the party urging the application of collateral estoppel because its application will serve the following purpose recently enunciated by the Supreme Court:

> To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.

*Montana v. United States,* 440 U.S. at 153–54, 99 S.Ct. at 973–74 (footnote omitted). While I do not favor precluding a federal agency's ability to test its policy decisions in more than a single circuit, in circumstances where the same defendant is sued *in seriatim* without the agency attempting to exhaust its appeals on the previous judgment, the equities favor application of collateral estoppel and not its abdication. Thus, in my opinion, application of the rule is proper.

SILER, District Judge, concurring.

I concur with the majority opinion on the merits but disagree with it on procedural grounds, that is, I believe the doctrines of collateral estoppel and res judicata should not be applied here.

Where the history of the cases shows that in *Stauffer I,* as designated in the majority opinion, the Wyoming district court opinion in favor of the EPA was rendered on June 23, 1980, there was legal authority for the action of the EPA at the time it obtained a warrant and went to inspect the Tennessee plant on August 7, 1980. Then, the district court in this case held its hearing on August 29, 1980, while the district court opinion from Wyoming was the only available court decision on the subject.

Next, the district court in Tennessee below rendered its decision on April 17, 1981, not precluded at all from deciding the case by res judicata or collateral estoppel. Then, on May 8, 1981, the opinion from Wyoming was affirmed in *Stauffer Chemical Co. v. E. P. A.,* 647 F.2d 1075 (10th Cir. 1981). Apparently no further appeal was attempted in that case, although a rehearing was denied on June 16, 1981. Finally, before the case at bar was argued, the decision in *Bunker Hill Co. Lead & Zinc Smelter v. United States E. P. A.,* 658 F.2d 1280 (9th Cir. 1981), was decided on October 13, 1981.

Res judicata is not applicable here, as a cause of action different from that in

*Stauffer I* was involved, but collateral estoppel would be applicable. *See Commissioner v. Sunnen,* 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948); *Hart v. Federal Reserve Bank of Atlanta,* 270 F.Supp. 296 (M.D.Tenn.1966) (Miller, J.), *aff'd,* 379 F.2d 961 (6th Cir. 1967), *cert. denied,* 390 U.S. 924, 88 S.Ct. 849, 19 L.Ed.2d 983 (1968); *see generally Cream Top Creamery v. Dean Milk Co.,* 383 F.2d 358 (6th Cir. 1967).

However, as stated in *Western Oil & Gas v. United States E. P. A.,* 633 F.2d 803, 808 (9th Cir. 1980), federal appellate courts "traditionally have permitted federal agencies to relitigate substantially identical *legal* issues raised by different transactions or events, after adverse decisions elsewhere." That court went on to say at 809:

> Collateral estoppel is not to be applied mechanically. In proper circumstances, it can prevent the waste of judicial resources and shield litigants from duplicative and often vexatious law suits. As the Supreme Court has recently recognized, however, countervailing policies may justify a refusal to apply principles of estoppel.

This doctrine was followed in *Castorr v. Brundage,* 674 F.2d 531 (6th Cir. 1982), where the Court stated:

> We do not hold that the application of the principles of res judicata and collateral estoppel is mandatory in every case. They are an expression of the policy of federal courts preferring finality, *i.e.,* that litigation at some time must become final. In the face of more important federal policies, however, the preference for finality might be outweighed by more compelling considerations.

*Id.* at 536. *Accord, Restatement of Judgment* § 70 (1942) (collateral estoppel not to be invoked if injustice would result).

Here, injustice would result if EPA were precluded from entering with private contractors at Stauffer's plant in Tennessee, but were using private contractors in entering competitor's plants in the same area. Likewise, where several different cases involving the same issues are being litigated simultaneously in separate circuits, collateral estoppel should not be invoked. Thus, collateral estoppel, although legally applicable, is not appropriate here.

Nevertheless, I concur with the majority opinion on the merits of the issue. Where the federal government has embarked upon a policy so radically divergent from its stan-

dard policy, that is, having only government officers or employees executing search warrants and inspecting plants, it seems that authority for such conduct should be clear from the Act itself or from legislative history. As the authority to allow the private contractors to be used under the circumstances of this case is not at all clear, EPA should not be allowed to use these private contractors for such inspections until Congress amends its legislation. *Cf. Bread Political Action Committee v. Federal Election Commission*, —— U.S. ——, 102 S.Ct. 1235, 71 L.Ed.2d 432 (1982).

In concurring with the majority opinion to reverse the district court I am not suggesting that the lower court "missed the signs on a well marked trial," *Getty v. Reed*, 547 F.2d 971, 975 (6th Cir. 1977), for when it rendered its decision below, it had no benefit of an appellate court decision directly on point.

### ORDER

No active judge of this court having requested that a vote be taken on the suggestion of the appellee that its petition for rehearing be heard en banc, said petition for rehearing was therefore referred to the panel for consideration and determination.

Upon consideration of the petition for rehearing, we are of the view that the issues in this appeal were adequately dealt with in our slip opinion and that the petition lacks merit. The appellee has not demonstrated that EPA in conducting a pollution inspection and search of private commercial property of Stauffer Chemical Company needs the services not only of its own employees as well as the employees of the State of Tennessee, but in addition thereto requires the services of a private contractor who is a competitor of Stauffer with conflicting interests who may have an axe to grind and may be interested in obtaining trade secrets of Stauffer.

The petition for rehearing is denied.